UNITED STATES of America, Plaintiff–Appellee,

v.

Mark A. PATTERSON, Defendant–Appellant.

No. 93–2693.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1994.

Decided May 11, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 14, 1994.

 

 

Rodger A. Heaton, Asst. U.S. Atty., Lee H. Dodd (argued), Springfield, IL, for plaintiff-appellee.

Lance T. Jones (argued), Springfield, IL, for defendant-appellant.

Before WOOD, Jr. and KANNE, Circuit Judges, and FOREMAN, District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

A jury found Mark Patterson guilty of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Because he had at least three previous convictions for violent crimes, the district judge determined that he was eligible for enhanced penalties pursuant to the Armed Career Criminal Act. 18 U.S.C. § 924(e). Ultimately the judge sentenced Patterson to 288 months in prison. Patterson now appeals both his conviction and his sentence.

## I.

On June 7, 1992 Anita Witherspoon and Kyle Taylor were at Comer Cox Park in Springfield, Illinois. They were seated in Witherspoon's car. Mark Patterson ("the

---

* The Honorable James L. Foreman, United States District Judge for the Southern District of Illi- nois, sitting by designation.

defendant") and his cousin, James Patterson were in a car parked next to Witherspoon and Taylor. At some point James Patterson approached Kyle Taylor and had a discussion with him. He then took $88.00 from Witherspoon and returned to his car.[1] Following this, Witherspoon took a machete from her trunk and approached the other car in an attempt to get her money back.[2] James Patterson and the defendant pointed guns at her and threatened to kill her if she did not leave immediately. According to her, the defendant's gun was longer than James Patterson's gun. She left the park, but as she left she noted the license plate number of the defendant's car.

She reported the incident to the police and provided a description of the car as well as the name of the defendant. Less than an hour later, the police stopped a car matching the description Witherspoon had given. The defendant was driving. Two passengers were in the car who were not involved in the incident at the park. The police searched the car and found a .38 caliber revolver on the front passenger floorboard. The gun was protruding from a bag and visible to one looking in the car. Witherspoon and Taylor identified the defendant as being involved in the incident. Witherspoon also identified the gun. During the trial Witherspoon testified to these facts and identified the .38 caliber revolver (Government's exhibit 1) as the gun that the defendant had used to threaten her life.

The other two main witnesses, Kyle Taylor and James Patterson, both testified that the defendant did not have a gun during the incident. The prosecutor impeached them with prior inconsistent statements in which they had each stated that the defendant was in possession of a gun.

The jury began deliberating on December 8, 1992. At the end of their deliberations that evening, the district court excused one juror, because she had a prior commitment. The court instructed the jury to proceed the next morning with eleven jurors. During the remaining deliberations, the jury sent several inquiries to the court. It requested the transcript of Anita Witherspoon's testimony, a definition of reasonable doubt, and the transcript of the testimony of one of the witnesses used to impeach another witness. Although the court was prepared to allow the jury to view Witherspoon's testimony, they reached a verdict before the transcript was prepared. The court denied the request for the impeachment witness' transcript and instructed the jury that no fixed definition of reasonable doubt existed. The jury returned a verdict of guilty. After finding that the defendant had been convicted of at least three violent crimes in the past, the court applied the Armed Career Criminal Act in conjunction with the sentencing guidelines.

## II.

The defendant raises the following arguments on appeal: 1) the government failed to present sufficient evidence to convict him of possessing a firearm beyond a reasonable doubt; 2) the government's impeachment of its own witnesses was improper; 3) the conduct of the prosecutor during the trial deprived the defendant of his right to a fair trial; 4) the court erred by applying the Armed Career Criminal Act; 5) the court erred by communicating with the jury without the defendant being present; 6) the court erred by dismissing one juror and allowing the remaining eleven to deliberate without substituting an alternate. We address each of these arguments below.

### A. Sufficiency of the evidence

■ The defendant first argues that the government failed to present sufficient evidence to convict him beyond a reasonable doubt. When reviewing the sufficiency of

1. Different witnesses presented differing accounts of this event. In one version, James Patterson had agreed to sell Taylor a quantity of drugs and the $88.00 was in payment for those drugs. Anita Witherspoon testified, however, that Patterson simply reached into the car, removed $88.00 that was lying in a drink holder on the center floor board of the car, and walked back to his car.

2. In the drug deal version of the event, Patterson had delivered only soap instead of genuine drugs. After learning of this Witherspoon sought the return of the purchase price.

the evidence we ask "whether any rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, viewing the evidence and every reasonable inference in the light most favoring the prosecution." *United States v. Colonia,* 870 F.2d 1319, 1326 (7th Cir.1989). The main issue at trial was whether the defendant knowingly possessed the firearm charged in the indictment, a .38 caliber revolver. The government introduced this gun as Government's Exhibit 1. Furthermore, the government called Anita Witherspoon as a witness. She testified that she was present at Comer Cox Park when the defendant pointed a gun at her and threatened her life. She also testified that the gun he used to threaten her looked exactly like Government's Exhibit 1. After the incident in the park, the police, acting upon Witherspoon's report, arrested the defendant and found Government's Exhibit 1 in the car he was driving. At the time of the defendant's arrest, Witherspoon identified both the defendant and the gun. This evidence is sufficient to allow a jury to conclude that the defendant was knowingly in possession of the .38 caliber revolver on the day of the incident in Comer Cox Park.

The defendant's attempt to minimize the importance of this evidence stems from his characterization of Witherspoon's testimony as "inherently incredible," a characterization that is inaccurate. We have previously held that "[t]o be incredible as a matter of law, the testimony must be incredible on its face, it must be 'impossible under the laws of nature for the occurrence to have taken place at all.' " *United States v. Hernandez,* 13 F.3d 248, 252–53 (7th Cir.1994) (quoting *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989)). In support of his claim, the defendant makes several arguments.

First, he notes that in a previous hearing, Witherspoon had stated that Government's Exhibit 1 "looked more like the [gun James Patterson] had," not the gun the defendant used. At trial, however, she explained that at the hearing she was unaccustomed to seeing the gun with the trigger lock and tags that were placed on it. Those things made the gun appear shorter to her leading her to believe that it was James Patterson's gun. At trial she identified Government's Exhibit 1 as the defendant's gun because she then realized it was not as short as she initially believed. Her testimony was therefore always consistent. She consistently stated that the defendant had a gun and used it to threaten her. She consistently stated that his gun was shorter than his cousin's gun. Finally at trial she identified Government's Exhibit 1 as the gun the defendant pointed at her. Her explanation for why she earlier stated that it looked like the cousin's gun was perfectly consistent with all of her previous testimony. Therefore, this argument fails to establish that Witherspoon's trial testimony was incredible on its face.

Next the defendant notes that in earlier versions of the incident Witherspoon stated that the defendant's gun was silver; Government's Exhibit 1 is black. The defendant introduced this prior description as a means of impeaching Witherspoon's testimony. The jury is the final arbiter of questions pertaining to which witnesses to believe,[3] and which part of those witnesses' testimony to believe.[4] The fact that, shortly after a traumatic experience she initially provided a slightly different description of the gun does not render her trial testimony facially incredible. The inconsistency may affect her credibility but that credibility determination is for the jury to make, not this court.[5] Moreover, "[m]inor

3. *See United States v. Campbell,* 985 F.2d 341, 344 (7th Cir.1993) (noting that judging the credibility of witnesses is the role of the jury).

4. *See United States v. Colston,* 936 F.2d 312, 315 (7th Cir.) ("Generally, juries may reject parts of a witness's testimony while accepting other parts."), *cert. denied,* —— U.S. ——, 112 S.Ct. 403, 116 L.Ed.2d 352 (1991). In this case, the jury could have accepted Witherspoon's testimony that the defendant possessed a gun while

rejecting her earlier testimony that the gun was silver.

5. The defendant also contends that Witherspoon's testimony is incredible because it was contradicted by two other witnesses, Kyle Taylor and James Patterson. Again the contradiction by another witness does not affect the facial credibility of her testimony; it does not render her version of the facts "impossible under the laws of nature." Furthermore, both of those witnesses had made prior statements inconsistent with

inconsistencies in the testimony do not render it legally incredible." *Id.*[6]

### B. The government's impeachment of its own witnesses

■ The prosecutor called Kyle Taylor and James Patterson as witnesses and impeached both of them with prior inconsistent statements. Federal Rule of Evidence 607 allows any party to attack the credibility of a witness, even its own witness. Nevertheless, the prosecution may not

> call a witness that it [knows will] not give it useful evidence, just so it [can] introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence....

*United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir.1984). Defendant now contends that the government had such a bad faith purpose when it called Taylor and Patterson as witnesses. Specifically he claims that the government knew that neither witness would provide useful testimony and nonetheless called them, solely for the purposes of introducing their otherwise inadmissible prior inconsistent statements. The record does not support such a conclusion.

### 1. Impeachment of James Patterson

■ The government's decision to call James Patterson does not even hint at a bad faith purpose. By all accounts, prior to trial, James Patterson had stated unequivocally that the defendant possessed a gun during the incident in Comer Cox Park. At trial however, he changed his story and testified that the defendant did not have a gun. Consequently, the government introduced his prior inconsistent statements to impeach him. The government had ample reason to believe that Patterson would provide useful evidence. The defendant notes that just prior to trial Patterson "purportedly" told prosecutors that he was reluctant to testify against a

family member (e.g. his cousin). From this the defendant asks us to conclude that the prosecutors knew Patterson would provide false testimony, or at least testimony that would differ from his previous statements. The government is not bound by such speculation when making the decision to call a witness. In fact, quite the opposite is true; "an attorney is entitled to assume that a witness will testify truthfully." *United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993). The prosecutor was entitled to assume Patterson would not change his story to protect family members when he was under oath in open court. Therefore the decision to call Patterson as a witness was well within the parameters of Rule 607 and lacked even a suggestion of bad faith.

### 2. Impeachment of Kyle Taylor

■ Similarly, the decision to call Kyle Taylor as a witness did not reflect a bad faith purpose. Taylor was an eyewitness to the events at Comer Cox Park. In statements after the incident he had corroborated every element of Anita Witherspoon's testimony. Shortly prior to the trial, however, Taylor indicated to the prosecution that he had changed his story and would now testify that the defendant did not have a gun. Otherwise his testimony would be consistent with his previous statements. Knowing this the prosecutor nevertheless called Taylor to testify. He testified that: the defendant and James Patterson were present in the park; James Patterson approached Witherspoon's car and removed $80.00; Witherspoon grabbed a machete and went to recover her money; and James Patterson pointed a gun at her. All of this testimony was consistent with and helpful to the government's case. Therefore we cannot conclude that the prosecutor called Taylor knowing he would not provide useful evidence; she called him knowing that he

---

their own trial testimony; each had previously stated that the defendant possessed a gun during the incident.

**6.** The jury was instructed in this case that in addition to considering actual possession, it could also find the defendant guilty if it found he

had constructive possession, based on the presence of the gun in the car he was driving. Because we conclude that there was sufficient evidence to support a finding of actual possession we need not address defendant's argument's regarding the constructive possession instructions.

would corroborate vast portions of Witherspoon's testimony.

■ Taylor did testify, as he indicated he would, that the defendant did not have a gun. This was admittedly not useful to the government's case. It does not, however, negate the usefulness of the other testimony Taylor provided. The most that we can say about Taylor as a witness is that he provided testimony that was both helpful and harmful at the same time. In such a case the prosecutor is allowed to call the witness and discredit the harmful testimony with prior inconsistent statements if possible. *See United States v. Kane,* 944 F.2d 1406, 1412 (7th Cir.1991) ("When a government witness provides evidence both helpful and harmful to the prosecution, the government should not be forced to choose between the Scylla of foregoing impeachment and the Charybdis of not calling the witness at all.").[7]

### 3. Impeachment based on bogus drug transaction

■ In addition to changing his story regarding whether the defendant had a gun, Taylor also changed his story regarding a bogus drug transaction. Shortly after the incident, Taylor and Patterson each gave statements in which they indicated that the incident was precipitated by a bogus drug transaction. According to the statements, Taylor had attempted to buy drugs from Patterson. Patterson delivered soap instead of drugs but collected $88.00 anyway. At trial Taylor testified that there was no attempted purchase of drugs. The prosecutor impeached him with his prior inconsistent statements.

Before trial the defendant filed a motion in limine to exclude any testimony about this drug transaction. The court denied that motion. He renews his objection now and contends that it was error to allow the impeachment evidence. He argues that this was a collateral matter and the court should not have allowed the government to introduce extrinsic evidence for impeachment purposes.

■ The existence of a bogus drug transaction clearly was not collateral to the main issues in the trial. An issue is collateral if it could not be introduced for any reason other than contradiction. *United States v. Jarrett,* 705 F.2d 198, 207 (7th Cir.1983). The defendant was indicted for possessing a firearm in connection with certain events arising on June 7, 1992. It is impossible to present adequate evidence concerning the possession of the firearm without describing the events immediately leading up to that possession. James Patterson testified that Kyle Taylor asked him if he had anything with which to "get high," "meaning a drug of some sort." He then delivered soap to Taylor and received roughly $80.00. Shortly after he delivered the soap and took the money, Anita Witherspoon approached the defendant's car brandishing a machete. At that time, both the defendant and his cousin threatened Witherspoon with guns. The evidence of the drug transaction is relevant to, and inextricably intertwined with, the threat with the machete and the counter threat with the guns. The drug transaction and the possession of the firearm thus are not separate unrelated events but integral parts of one single incident. Therefore it was not error to allow impeachment evidence on this point as that evidence could have been, and in fact was, admitted for a purpose other than contradiction.[8]

7. The defendant also argues that the prejudicial effect of the prior inconsistent statements substantially outweighed the probative value and thus the court erred by allowing them. *See* Fed. R.Evid. 403. Because the defendant did not raise this argument at trial, he has forfeited it. Therefore, we may only reverse based on this argument if the district court committed plain error. *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). Finding plain error under Rule 52(b) requires that the defendant show he was prejudiced by the error (i.e. he must show that the error "affected the outcome of the District Court

proceedings."). *Id.* —— U.S. at ——, 113 S.Ct. at 1778. In this case the evidence against the defendant was substantial even excluding the prior inconsistent statements of these witnesses. *See* Section II.A. Therefore, assuming for the purposes of discussion that the court erred by allowing the impeachment, we conclude that the defendant has not shown any prejudice and is not entitled to a reversal.

8. James Patterson gave a signed statement to the police on June 17, 1992. This statement described the bogus drug transaction in detail. The district court allowed this statement, Gov-

### C. Defendant's attempt to rehabilitate a witness

During direct examination, James Patterson indicated that he saw only one gun on the day of the incident in Comer Cox Park. Later the prosecutor confronted him with statements he made shortly before he testified, in which he indicated that there were two guns. The prosecutor then asked him what had happened to change his testimony and specifically asked him if he had met with the defendant's attorney in that short interim period. The defendant now argues that this line of questioning amounted to a charge that the witness had recently fabricated his testimony after meeting with defense counsel. He argued at trial, and argues here, that he was entitled to introduce prior consistent statements in order to rebut that charge of fabrication pursuant to Federal Rule of Evidence 801(d)(1)(B).

■ That rule specifically permits the introduction of a witness' prior consistent statements if the declarant testified at trial subject to cross-examination and his prior consistent statements are offered to rebut an express or implied charge of recent fabrication. In addition to those requirements the witness must also have made the statements before he had a motive to fabricate. *United States v. Fulford,* 980 F.2d 1110, 1114 (7th Cir.1992). The reasoning behind the last requirement is that a statement made after the witness allegedly had a motive to fabricate is not relevant to rebut the charge of recent fabrication. *United States v. Harris,* 761 F.2d 394, 399 (7th Cir.1985). The proffered prior consistent statements here do not satisfy the last element of the test.

The witness had met with the defense counsel and another attorney, shortly before trial. According to the defendant's argument, the prosecutor implied that the witness fabricated his testimony during the meeting with the defense counsel. In response he called the other attorney who was present to testify that during that meeting the witness stated there was only one gun, a statement that would be consistent with the witness' trial testimony. The alleged motive to fabricate arose in connection with that meeting. Therefore, the rule would only permit admission of consistent statements that the witness made before the meeting. The proffered testimony, that during the meeting the witnesses said there was only one gun, is not relevant to rebut a charge that he fabricated his testimony during that meeting and the court properly excluded it.

### D. The conduct of the prosecutor

The defendant alleges that several instances of prosecutorial misconduct deprived him of a fair trial. First he contends that the prosecutor implied that defendant's counsel unethically influenced a witness to change his testimony. Next he argues that the prosecutor improperly elicited and relied upon testimony that the defendant had threatened a witness and that another witness, James Patterson, was reluctant to testify against defendant because he is a family member. Finally, he argues that the prosecutor interjected her own opinion as to the credibility and truthfulness of witnesses and misstated the record in her arguments. Our task when analyzing a claim of prosecutorial misconduct is twofold. *United States v. Goodapple,* 958 F.2d 1402, 1409 (7th Cir.1992). First we ask if the comment was improper. *Id.* If it was indeed improper we then consider if it deprived the defendant of a fair trial. *Id.*

### 1. The implication of unethical conduct

This issue arises out of the same comments that formed the basis of the defendant's arguments pertaining to the rehabilitation of one of the witnesses. *See* § II.C. above. The prosecutor while questioning James Patterson asked how many guns he saw on the day of the incident. He indicated that he

ernment's Exhibit 13, into the jury room. The defendant claims that this was error. He cites no authority for such a proposition. He makes no reference to the record and he provides no supporting argument. His entire argument reads as follows: "It was error to allow [the statement] to go back to the jury." This is not sufficient to satisfy the mandate of Federal Rule of Appellate Procedure 28(a)(5), which provides that arguments must "contain the contentions of the appellant ... and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on." Consequently we decline to address the issue.

only saw one, his gun. She then confronted him with prior inconsistent statements in which he indicated there were two guns. Those statements had come only a few hours earlier, while he was being interviewed by the prosecutor. After the witness testified that he saw only one gun the following colloquy occurred:

Q. Mr. Patterson, from this morning until today, just a few hours later, what has happened that has caused your testimony to change?

A. I don't feel it has changed, it's your opinion.

Q. You met with Lance Jones, who's [the defendant's] attorney. Isn't that right?

A. Correct.

Q. And you met with him immediately prior to your testimony here. Isn't that right?

A. Yes, I did.

The prosecutor returned to this topic in her closing argument. While discussing the credibility of James Patterson as a witness she stated:

James Patterson, after meeting with me in my office, then met with defense counsel and another attorney. And you've heard testimony in reference to that meeting. That's the only thing that occurred between this morning and the time that he testified in this matter, which was approximately two hours later, perhaps two and a half, and that somehow in a two-and-a-half-hour period James Patterson's testimony changed from there were two guns at Comer Cox Park on that day to I only saw one gun, the gun that I had.

From this the defendant argues that the prosecutor implied that the defendant's at-

torney caused the witness to change his testimony, i.e. that he acted in an unethical way.

▇▇▇▇ We agree with the Ninth Circuit that it is improper to "state that defense counsel, in general, act[ed] in underhanded and unethical ways, and absent any specific evidence in the record, no particular defense counsel may be maligned." *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir.1983), *cert. denied*, 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984). The defense counsel has a right to interview witnesses and the charge that the mere fact that such an interview takes place suggests the defense counsel acted unethically is not justified. We find that the prosecutor's comments do not cross the very fine line between permissible advocacy, and improper imputation of unethical behavior. The prosecutor was commenting on facts that were in evidence, namely that the witness' story had changed in a short period of time and that he had met with defense counsel. The prosecutor need not ignore the circumstances and evidence surrounding the prior inconsistent statements. The jury is entitled to draw its own conclusions from all of the evidence. Although the defendant argues that the prosecutor's comments were tantamount to her insinuating that the defense counsel acted improperly, we do not agree. The comments, which were tied very closely to the evidence, were within the realm of permissible advocacy.[9]

### 2. Evidence of threats against government witnesses

After Kyle Taylor testified that the defendant did not have a gun during the incident in Comer Cox Park, the prosecutor sought to impeach him by introducing his prior inconsistent statements. She did this by calling Special Agent Chuck Sharp to testify that

**9.** The defendant cites *Bruno v. Rushen* for the proposition that these comments were improper. 721 F.2d at 1193–95. In that case, the prosecutor made comments that were completely improper and different than those involved in this case. In *Bruno*, one of the witnesses had met with another defendant's attorney. Referring to that meeting, the prosecutor referred to the attorney's conduct as "machinations" and referred to the witness as a "malleable" "puppet[.]" *Id.* at 1194 n. 2. Next he asked rhetorically: "What kind of pressures did [the attorneys] exert on her?" *Id.* He referred to a defense attorney as a

"Judas" betraying the criminal justice system and suggested that the defendant's act of hiring an attorney suggests guilt. The court held that comments such as these that suggest the defense attorneys acted in "unethical" and "underhanded" ways are improper and that the suggestion that a defendant's act of hiring an attorney is probative of guilt is also improper. *Id.* The comments involved in this case do not rise to the level of impropriety exhibited in the *Bruno* case. The remainder of the cases the defendant cites are also distinguishable, factually and legally, and merit no discussion here.

Taylor had previously given a different version of the events in a meeting with the prosecutor and Sharp. While the prosecutor was questioning Sharp regarding their meeting with Taylor, the following exchange took place:

Q. Did I ask [Taylor] just to tell me his version of what occurred?

A. Yes. That's correct.

Q. And after I asked him that question, what was his response?

A. At first he said he was—he did not want to testify as he had been threatened shortly after the incident. . . .

(Defense counsel objected on the grounds of hearsay and the court overruled the objection).

Q. After we briefly discussed that did he agree to tell me what happened on that day?

A. Yes, he did.

The defendant now argues that it was improper for the prosecutor to elicit this testimony of a threat because there was no substantive evidence of any threats. *See United States v. Rios*, 611 F.2d 1335, 1349 (10th Cir.1979) (holding that "references to threats or danger to prosecution witnesses are improper unless admissible testimony is offered connecting the defendant with the threats or danger").[10] The government does not argue that this statement regarding the threats to the witness was not hearsay. In fact the statement was clearly hearsay, originating from an unidentified party. It was an out-of-court statement, offered to show the truth of the matter asserted—that the witness was threatened leading to him changing his version of the events. The court erred by allowing this evidence over the defendant's hearsay objection.

Nevertheless we conclude that this error was harmless. The statement did not directly indicate that the defendant had threatened the witness. In fact, the statement contains no reference to the defendant whatsoever. Furthermore, we find that any suggestion of a threat did not in any way contribute to the jury's verdict. The government did not make any reference to this threat in any of its arguments to the jury; rather, it plainly ignored the statement. Moreover, the evidence against the defendant—the testimony of Anita Witherspoon that the defendant pointed the gun at her and the discovery of the gun found in the car the defendant was driving—was sufficient to enable the jury to convict the defendant. Thus the admission of the implied threat was harmless.[11]

3. Interjection of the prosecutor's opinion and misstatement of the record

a. Interjection of opinion during the examination of a witness

While cross-examining Kyle Taylor, a government witness, the defendant's attorney asked the following question relating to the prosecutor's prior interview of the witness:

Q. So you tried to tell the truth, but she [the prosecutor] didn't want to hear about it?

Responding to this direct attack, on re-direct examination, the prosecutor sought to elicit from the defendant that at no time did she intimate that she was not interested in the truth. The questions were as follows:

Q. And it was on [November 25th] that you told me that your story had changed from our earlier meeting of November 6, 1992, isn't that right.

A. . . . yeah . . .

Q. Well, we had another meeting at my office. . . . And that's when you told me you sort of thought about it, and you decided your earlier story wasn't exactly right?

A. Right.

---

10. The defendant's only objection was that this statement was inadmissable hearsay. He did not request that the response be stricken or that the jury be instructed to disregard it.

11. At another point in the trial the prosecutor asked Kyle Taylor what had happened, other than meeting with the defendant, that could have caused him to change his story and now claim the defendant did not have a gun. The defendant argues that this line of questioning implied that the defendant threatened Taylor. Such a conclusion is nothing but speculation.

Q. And maybe Mark Patterson didn't have a gun?

A. No. He didn't have one.

\* \* \* \* \* \*

Q. I told you in my office, I didn't believe your second story was true. At that time I explained to you what the penalties for perjury would be, right? I didn't threaten you with any—.

A. You basically told me federal court is different · from state court and what could happen to me.

\* \* \* \* \* \*

Q. I didn't tell you at any time that I wasn't interested in the truth in this matter, as we sat and talked about it that day? You told me your story, and you didn't recall the same events?

A. Right.

▪ The defendant argues that the prosecutor's comment—that she told the witness that she did not believe his second story— amounted to an impermissible interjection of her personal opinion. Actually the prosecutor was not interjecting her personal opinion. She was merely responding to an attack by the defense attorney that she "didn't want to hear about [the truth]." This amounts to an "invited response" as that term is used in *United States v. Young*, 470 U.S. 1, 11–13, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). The prosecutor's allegedly improper comment was presented indirectly and merely set a backdrop for her principal question regarding whether or not she ever said she was not interested in the truth. We conclude that she did no more than "right the scale" that was tipped by the defense counsel's question; therefore, her comments were not improper. *Id.*[12]

#### b. Interjection of opinion during closing arguments

The prosecutor during closing argument made reference to the fact that Kyle Taylor had changed his story of the events of June 7, 1992. Originally, he told the prosecutor and a government agent that there was an ill-fated drug deal and that the defendant had a gun. Later, as we noted above, Taylor testified at trial that actually there was no drug deal and the defendant did not have a gun. He claimed that his original version of the events was different because he was lying to the government agent and prosecutor just so he could leave. During closing arguments, while addressing this claim that Taylor's first version was untrue, the prosecutor stated:

> Kyle Taylor wants you to believe that he's being truthful at trial, that Mark Patterson didn't have a gun ... and that he was lying when he talked to me on November 6th 1992 [because] he wanted to get out of my office.
>
> He knew I was an Assistant United States Attorney. He knew Chuck Sharp was a law enforcement officer. He would have said anything, according to his testimony. And therefore, his statements on November 6th were a lie.
>
> **I think it is an odd lie** to tell a United States Attorney and a Federal law enforcement agent that you were involved in a drug deal. **And I think that is something you can consider** when determining Kyle Taylor's credibility at trial and determining whether Kyle Taylor was truthful.... (emphasis added)

The defendant argues that these comments amounted to the prosecutor improperly interjecting her opinion as to the truthfulness of a witness' testimony. Because he did not raise this objection at trial we review these comments for plain error only. *United States v. Olano*, — U.S. —, —, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993).

▪ A prosecutor may not interject personal opinion about the credibility or truthfulness of a witness; however, she may comment on the credibility of the witness "so long as the comment reflects reasonable inferences from the evidence adduced at trial...." *Goodapple*, 958 F.2d at 1409–10. In this case, although the prosecutor used the phrase "I think" in reference to the credibility of Taylor's testimony—that his first story

12. We note that at different points in the case both attorneys have objected to their opposing counsel's suggestion of improper behavior.

was a lie, we nonetheless conclude that she did not interject her personal opinion, but merely commented on the inferences one could draw from the evidence.[13] The witness claimed his first story was a lie. Noting that the witness presented this lie to an Assistant United States Attorney, the prosecutor drew an inference about the credibility of the witness' position. This inference was supported by the evidence and thus was not improper. We therefore need not address the issue of prejudice.[14]

### c. Misstatement of the record

Also during her closing arguments, the prosecutor argued that Anita Witherspoon "always stated that it was James Patterson and not the defendant, Mark Patterson, who ripped her off." She went on to argue, that therefore, Anita Witherspoon had no reason to be angry at Mark Patterson, against whom she testified. The defendant contends that this was a misstatement of the record because Anita Witherspoon stated that two men had robbed her. This is in fact true. She never stated, however, that Mark Patterson robbed her. Therefore the prosecutor did not misstate the record.

### E. The district court's decision to proceed with eleven jurors

The trial in this case lasted for only two days. The jury retired for deliberations at 5:00 pm on Friday, December 8, 1992. The district court did not discharge the alternate jurors but sequestered them. *See contra,* Fed.R.Crim.P. 24(c) (mandating that the district court discharge all remaining alternates when the jury begins its deliberations). The record indicates that one hour later the jury interrupted their deliberations for a dinner at a local restaurant. After returning, the jury continued deliberations until approximately 9:45 pm that evening. At that time the district court excused juror number 226, Patricia Lucas, and instructed the jury to reconvene the next morning with only eleven jurors. The court indicated its decision to excuse the juror in a note that it sent to the jury. That note is part of the record.[15]

At the time the court made the decision to excuse the juror, it apparently held a brief conference with the attorneys in the case. There was no court reporter present to transcribe the discussions. Furthermore, nothing in the record indicates that the defendant was present or even told that the jury deciding his fate was about to be reduced from twelve to eleven people.[16] Such procedures invite, if not guarantee, an ardent challenge on appeal.

The following day the jury of eleven continued deliberating for about four hours. At

13. We have previously held that it was improper for a government attorney to use the term "I think" when commenting on the evidence during closing arguments as that term reflects the prosecutor's personal opinion. *United States v. Bartemio,* 547 F.2d 341, 345–46 (7th Cir.), *cert. denied,* 419 U.S. 994, 95 S.Ct. 305, 42 L.Ed.2d 266 (1974). The facts in *Bartemio,* however, involved the "repeated use" of that expression. *Id.* at 345. Here the defendant has identified only this one occasion during which the prosecutor used the expression.

14. The prosecutor also mentioned in her closing argument that she had to have a witness arrested and she did not enjoy doing that. The defendant argues that this amounted to vouching for the incredibility of the witness. We see no reason to accept the defendant's argument. We conclude that the prosecutor's statement, that arresting the defendant was "[n]ot something, quite frankly, [she] wanted to do or considered to be a pleasant experience" was not in any way prejudicial to the defense, although it was an unnecessary and improper comment.

15. The record does not indicate when or how the judge learned of this juror's prior commitment. We assume that it was first disclosed in voir dire. The jury was chosen several weeks before the actual trial date; there is no explanation in the record for this bifurcated process. In situations such as this one, where the voir dire occurred long before the jury actually began deliberations, a district judge may be well-advised to inquire again, before the trial begins, if there is some reason why any of the jurors may not now be able to serve. If the judge had made such an inquiry in this case he would have been reminded that the juror was unable to serve. At that time he could have substituted an alternate, thus proceeding with the preferable full jury of twelve people and avoiding this challenge on appeal. Fed.R.Crim.P. 24(c).

16. The defendant does not argue that he had a right, pursuant to Federal Rule of Criminal Procedure 43(a), to be present when the court made the decision to excuse the juror; therefore we leave that issue for another day.

that time they returned a verdict of guilty. The court then discharged the jurors and the alternates. Following this the court made a record of its decision to excuse juror 226. The entire record pertaining to that decision is reproduced below.

Court:

Now, another matter of record that I think we should make at this time is that last night I excused Patricia Lucas, Number 226, at 10:00 o'clock when [the jury was] unable to reach a verdict by that time. She had already indicated that today, that is, the 9th of December, she was to be a chaperon [for] . . . a busload of students as I understand it, for a musical function of some kind in the State of Colorado from here and that this was of some longstanding.

\* \* \* \* \* \*

Defendant's Attorney:

I . . . know when we talked about the dismissal of one juror I asked whether one alternate could be substituted for that juror. . . .

Court:

That's true.

▮ This discussion along with the note to the jury is the only reference in the record to the dismissal of the juror. Therefore, we must conclude that the only objection the defendant raised was that the court should have substituted an alternate juror. We confine our discussion to that issue.[17]

Federal Rule of Criminal Procedure 23(b) provides in part that

[i]f the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

We review the district court's decision to discharge a juror pursuant to this statute for abuse of discretion. The defendant argues that the district court's failure to substitute an alternate was such an abuse of discretion. Although the procedure the district court followed when excusing the juror was flawed, we cannot accept the defendant's argument.

After a jury begins to deliberate the district court must discharge all alternates. Fed.R.Crim.P. 24(c) ("An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."). The Rules provide no means by which a discharged alternate may be recalled after jury deliberations have begun. We have previously held that Rule 24(c) and the policy behind it "forbid the practice [of recalling alternates]." *United States v. Josefik*, 753 F.2d 585, 587 (7th Cir.), *cert. denied*, 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985). The Fifth Circuit has recently held, reading Rules 23(b) and 24(c) together, that it is not proper to substitute a discharged alternate after jury deliberations have begun. *See United States v. Huntress*, 956 F.2d 1309, 1314–17 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2330, 124 L.Ed.2d 243 (1993).

The next issue merits even less consideration. Although the Advisory Committee notes suggest that "if the trial has been brief and not much would be lost by retrial, the court might well conclude" that a mistrial is preferable to proceeding with eleven jurors, Note Advisory Comm. to 1983 Amendment to Fed.R.Crim.P. 23(b), nothing in the rule requires the judge to declare a mistrial in all brief trials. *See, e.g., United States v. O'Brien*, 898 F.2d 983, 986 (5th Cir.1990) (holding that "Rule 23(b) does not limit its application to lengthy or complex trials"). Under the particular circumstances of this case, we decline to hold that the court abused its discretion by not declaring a mistrial, despite the brevity of the trial. Thus there was no error, plain or otherwise.

---

**17.** On appeal, the defendant raises two other issues for the first time: 1) that he was entitled to an evidentiary hearing on the issue of "just cause"; and 2) because the trial was not lengthy, if the court found it necessary to excuse a juror it should have declared a mistrial. Because the defendant has forfeited these arguments by not raising them below, we review them for plain error only. *Olano*, —— U.S. at ——, 113 S.Ct. at 1777. On the first issue, we find that an evidentiary hearing would have been of little value. The record is clear that the juror had plans to leave the state and accompany students on a trip. Furthermore we may assume that one does not travel from Illinois to Colorado for a day, so her plans must have required her absence for some time. Therefore, the defendant has failed to show any prejudice resulting from the lack of an evidentiary hearing.

■ This case presents a slightly different question than *Josefik* and *Huntress* examined, however, because, contrary to Rule 24(c), the district court did not discharge the alternates when the jury began deliberations, but sequestered them.[18] Thus we must decide whether the district court abused its discretion by failing to substitute an available alternate rather than proceed to verdict with eleven jurors. The jury as originally constituted had been deliberating for at least one hour and possibly as much as three and one half hours.[19] As the advisory committee notes to Rule 23(b) suggest, even if the court replaced an excused juror with an alternate and ordered the jury to begin deliberations anew, "it still seems likely that the continuing jurors would be influenced by the earlier deliberations and that the new juror would be somewhat intimidated by the others by virtue of being a newcomer to the deliberations." Note Advisory Comm. to 1983 Amendment to Fed.R.Crim.P. 23(b). Recognizing this concern we have previously stated that "[a]n alternate who joins the jury's deliberations after they have begun, even if he has not discussed the case or forgotten the judge's (other) instructions in the interim, will be at a disadvantage in holding his own with the other jurors...." *Josefik*, 753 F.2d at 587.[20] Given the concerns that an alternate may be "disadvantaged" or "intimidated" and thus not able to participate fully and freely in the deliberations, we cannot say that the district court abused its discretion by refusing to make the substitution. The short time involved and the fact that the alternates remained sequestered, however, were factors for the district court to consider in consultation with the defendant, his counsel, and the government in the exercise of its discretion.

### F. The district court's responses to jury inquiries

During its deliberations the jury sent three inquiries to the district judge. In the first it requested the transcript of Anita Witherspoon's testimony. The district court discussed this inquiry with both attorneys. The discussion was not in open court, no court reporter was present, and the defendant was not present. The court decided to have the requested transcript prepared and sent to the jury. The jury reached its verdict, however, before they received that transcript.

■ The next inquiry from the jury asked for a definition of reasonable doubt. Again the court presented this inquiry to counsel but failed to do so in open court and failed to secure the presence of the defendant. The court instructed the jury that no set definition of "reasonable doubt" was available, which was the correct response.

Finally the jury requested the transcript of Special Agent Kevin Rollins' testimony. At trial the government had called Rollins to testify regarding James Patterson's prior inconsistent statements. His testimony was presented for impeachment purposes only. This jury inquiry was handled over the telephone. The district judge's secretary contacted the attorneys individually and informed them of the inquiry. They communicated their comments to the judge's secretary. The record does not indicate where the judge was during this time. The district court never personally conferred with counsel, nothing regarding this was done in open court, and the defendant was not present. After the jury returned a verdict of guilty, the district court allowed the attorneys a chance to make a record regarding the han-

---

**18.** The decision to sequester the alternate jurors is particularly perplexing in light of the fact that the judge did not use any of them to fill the vacancy on the jury when one occurred. Nevertheless the proper course of action is to discharge all of the alternates at the moment the jury begins deliberations. Fed.R.Crim.P. 24(c).

**19.** The jury retired at 5:00 p.m. and concluded for the evening at 9:45 p.m. The record indicates that at 6:00 they interrupted deliberations for dinner. Because the record does not indicate when they returned from that dinner, we cannot say with any degree of certainty exactly how long they were engaged in deliberations.

**20.** *Josefik* went on to hold that the substitution would not always be error. The court in that case substituted the alternate juror after the jury had deliberated for only nine minutes. Because the jury most likely considered nothing important in those initial nine minutes, we found that the alternate would be able to deliberate on a par with the other jurors. *Id.* at 587.

dling of the jury inquiries. The defendant noted that he had originally objected to the request for Special Agent Rollins' transcript, but conceded that that objection was moot because the court decided not to provide the jury with that transcript.

On appeal, the defendant now argues that the trial court erred in its handling of the jury inquiries and erred by responding to them without the defendant being present. His only specific objection pertains to the handling of the jury's request for Agent Rollins' transcript. The defendant argues that he had a right to be present and that if he was present, and if the inquiry was addressed in open court before the judge himself, he or his attorney may have suggested a rejoinder that reminded the jury that Rollins' testimony was presented for impeachment purposes only, rather than as substantive evidence. He notes that this particular jury inquiry came shortly after the jury requested a definition of reasonable doubt which, he argues, suggests that the jury was harboring reservations about whether the government proved its case beyond a reasonable doubt and began to place great emphasis on the impeachment evidence.

 The Supreme Court has previously identified the procedures the district court should follow when responding to jury communications in criminal cases. *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2094–95, 45 L.Ed.2d 1 (1975). The Court made clear that when faced with an inquiry from the deliberating jury, "the jury's message should [be] answered in open court and ... [defendant's] counsel should [be] given an opportunity to be heard before the trial judge respond[s]." *Id.* at 39, 95 S.Ct. at 2095 (cited in *United States v. Neff*, 10 F.3d 1321, 1324 (7th Cir.1993)). Furthermore, pursuant to Federal Rule of Criminal Procedure 43(a), the defendant has a right to be present at all stages of his trial, "which has been held to include the giving of supplementary instructions or other communications with a deliberating jury." *Id.* (citing *United States ex rel.*

*S.E.C. v. Billingsley*, 766 F.2d 1015, 1019 (7th Cir.1985)).

 The government in this case concedes that the district court erred in its handling of the jury inquiries it received. First, the inquiry was neither addressed nor answered in open court, and no court reporter was present.[21] Second, the inquiry concerning Agent Rollins' testimony was not handled by the judge but by his secretary. The secretary spoke with each attorney separately over the telephone. Proceeding in this unprecedented manner deprives each attorney of the chance to hear the other attorney's comments or objections and may seriously affect what each attorney has to say. Nothing in the record suggests what message the secretary conveyed to the judge. We conclude that this effectively stripped the defendant's attorney of "an opportunity to be heard." Such an opportunity is only present when the attorney is able to present his or her concerns, comments, and objections directly to the judge. Communicating with the attorneys separately and through an intermediary is insufficient. Finally, the defendant was not present and the court made no effort to secure a waiver of his right to be present or a waiver of the procedures outlined above. *See Neff*, 10 F.3d at 1324 ("[A] district judge, when faced with ... communications from the jury, should either follow the procedures in *Rogers*, or obtain from the defendant himself a clear and knowing waiver on the record.").

 Having held that the irregular handling of the jury inquiries was error, we must next address whether that error requires reversal of the defendant's conviction. The error here was twofold; first the defendant was not present; second the procedures employed were inadequate. The defendant, however, failed to raise both issues when he was given a chance to make his objections of record in the trial court. Consequently he has forfeited those errors. In such a case we would normally review them for plain error only. *Olano*, —— U.S. at ——, 113 S.Ct. at

---

**21.** We previously noted in a similar situation that "[i]f the district court had conducted its communications in open court as required by *Rogers*, then, pursuant to the Court Reporters Act, 28 U.S.C. § 753(b), the district court would have been required to have a court reporter present at the proceedings." *Neff*, 10 F.3d at 39.

1777. We have previously held, however, that the Rule 43(a) violation is subject to the **harmless error** standard, even in a case where the issue was not presented to the trial court. *United States v. Silverstein*, 732 F.2d 1338, 1348 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). On the other hand, the court's failure to follow the proper procedures for answering jury inquiries, ordinarily a sensitive part of the trial (in open court, before the judge, on the record and with the defendant present) is subject to the plain error standard of review.

▇▇▇▇ An error is harmless, if it does not affect "substantial rights." Fed. R.Crim.P. 52(a). To affect substantial rights, in most cases "the error must have been prejudicial," i.e. it must have affected the outcome of the case. *Olano*, —— U.S. at ——, 113 S.Ct. at 1777–78. This is the same test used to determine what affects substantial rights under the "plain error" standard of Rule 52(b). *Id.* The difference between the two is that under the harmless error standard the government has the burden of showing that the error was not prejudicial, whereas under the more stringent plain error test, the defendant must show that the error was prejudicial. *Id.* The distinction, however, is not controlling in this case because we conclude that, in the particular circumstances of this case, the government has shown that neither of the errors was prejudicial.

▇▇▇▇ The failure to secure the defendant's presence is harmless if the issue involved is not one "on which counsel would be likely to consult [the defendant]," or if it is not one for which the defendant, "if consulted, would be likely to have an answer that would sway the judge." *Silverstein*, 732 F.2d at 1348. In this case the question the jury posed was whether they could view the transcript of Agent Rollins' testimony. The defendant now asserts that if he had been present he may have suggested a rejoinder that reminded the jury that this testimony was offered for impeachment purposes only.[22]

This is a purely legal issue which depends upon a clear understanding of the Federal Rules of Evidence. We conclude that even if the defendant had been present, his counsel would not likely have consulted him. Furthermore assuming he was consulted, it is highly improbable that the defendant would have suggested a response that would have "swayed the judge." Therefore, we conclude that the failure of the court to secure the presence of the defendant was harmless error.

Similarly we see no reason to believe that if the inquiry were handled in open court that this new theory of the additional rejoinder would have occurred to the defendant's attorney. The record establishes that the defendant's counsel was well aware throughout the pendency of the trial that Agent Rollins' testimony was not offered for substantive purposes. Although an open conference between all parties concerning the jury's request for the transcript would have resulted in fuller discussion of the issue, we would be engaging in unnecessary speculation if we were to hold that the attorney would probably have suggested the rejoinder. The issue he raises is one of law; the testimony is relevant for impeachment purposes only. That legal principle was well-known. He did not suggest the rejoinder at the time of the telephone conference even though he knew the relevant law. Furthermore, he did not suggest the rejoinder hours later when he was given a chance to make objections of record. We cannot hold that a conference in open court would likely have affected this failure to raise the issue. Consequently the handling of the jury inquiry was harmless error. Nevertheless, by holding these errors to be harmless, in these particular circumstances, we do not mean in any way to condone the procedures used.

## G. Application of the Armed Career Criminal Act

▇▇▇ The Armed Career Criminal Act provides for enhanced sentences of any defendant who has previously been convicted of

22. The original instructions to the jury clearly indicated that the testimony was to be considered for impeachment purposes only.

# 1256

three violent felonies. 18 U.S.C. § 924(e). The district court found that the defendant had been convicted of four violent felonies. Three of the convictions were in Sangamon County, Illinois; 83–CF–325; 87–CF–121; and 88–CF–947, and one was in Winnebago County, Illinois, 89–CF–35. The defendant argues that the first conviction, 83–CF–325 was not a violent felony and that 88–CF–947 and 89–CF–35 should be considered one offense. This would produce a total of only two convictions for violent felonies. Because we conclude that the 1988 and 1989 crimes should be considered two separate offenses we need not address the defendant's arguments concerning the 1983 crime.

We have previously held that criminal convictions will be considered separate offenses for purposes of the Armed Career Criminal Act if they are "separate and distinct criminal episodes." *United States v. Schieman*, 894 F.2d 909, 913 (7th Cir.), *cert. denied*, 498 U.S. 856, 111 S.Ct. 155, 112 L.Ed.2d 121 (1990). In that case we held that "separate crimes against separate victims in separate locations" counted as separate crimes for purposes of the statute. *Id.* Here the defendant committed an armed robbery in Sangamon County on November 15, 1988 (88–CF–947). Three months later he committed another armed robbery in Rockford, Illinois (89–CF–35). We agree with the district court that these crimes amounted to separate criminal episodes. The defendant in fact concedes that this conclusion is proper under *Schieman* but asks us to reconsider that case. We see no need to do so. The convictions are separate offenses for purposes of the statute and the defendant's sentence was properly enhanced.

## III.

For the reasons expressed above, we conclude that none of the trial errors in this case requires a reversal, although this is a close case, not on the facts, but because of the trial errors involved. The conviction and the sentence are therefore

AFFIRMED.