HAMILTON, Circuit Judge,
joined by WOOD, Chief Judge, and ROVNER and WILLIAMS, Circuit Judges,
concurring in part and dissenting in part.
The en banc court agrees unanimously that the district court erred by admitting *865 under Rule 404(b) the evidence that Gomez was in possession of a small amount of cocaine nearly four weeks after the charged conspiracy ended. Its admission was not justified on any of the three grounds accepted by the district court and argued by the government to the jury. Judge Sykes’ opinion for the court on the merits of the Rule 404(b) question takes important and welcome steps to clarify this troublesome area of evidence law. See generally United States v. Gomez, 712 F.3d 1146, 1159-63 (7th Cir.2013) (Hamilton, J., dissenting). I therefore join Parts II-A and II-B-1 of Judge Sykes’ opinion.
Those joining this opinion also take this opportunity to provide an example of the type of jury instruction that should be given when evidence is admitted properly under Rule 404(b). Suppose the facts here had been different. Suppose (1) that Gomez had later possessed a wholesale quantity of cocaine of the same purity as the cocaine involved in the conspiracy, (2) that the government had shown that the cocaine would be probative of Gomez’s identity and not unfairly prejudicial, and (3) that the defendant wanted a limiting instruction. A good instruction consistent with our circuit’s Pattern Instruction 3.11 would be:
You have heard testimony that the defendant committed acts other than the ones charged in the indictment. Before using this evidence, you must decide whether it is more likely than not that the defendant took the actions that are not charged in the indictment. If you decide that he did, then you may consider that evidence to help you decide whether the defendant was the same person as the one called “Güero.” You may not consider this evidence for any other purpose. To be more specific, you may not infer that, because the defendant committed an act in the past, he must have committed the crimes charged in the indictment. The reason is that the defendant is on trial here for specific charges of conspiracy to possess cocaine with intent to distribute and using a telephone to facilitate a drug crime. He is- not on trial for those other acts. It is the government’s burden to prove beyond a reasonable doubt the elements of the specific crimes charged here. The government cannot meet its burden by inviting you to infer that the defendant is a person whose past acts suggest he has a bad character or a tendency to commit crimes.
Nevertheless, after having done so much to improve our circuit’s law under Rule 404(b), the en banc majority still affirms Gomez’s conviction despite the serious Rule 404(b) error. The majority does so by finding that the Rule 404(b) error was harmless, in Part II-B-2 of its opinion. From this conclusion and the resulting af-firmance, I respectfully dissent. We should reverse this conviction and remand for a new trial without the highly prejudicial evidence admitted erroneously under Rule 404(b).
To be sure, the government’s case against the person called “Güero” was airtight. But was Gomez “Güero”? The government offered substantial evidence that he was. But that evidence is not as clear as the majority contends, particularly when we keep in view the requirement of proof beyond a reasonable doubt. The applicable standard for harmless error is provided by Federal Rule of Criminal Procedure 52(a), which requires the court to disregard an error that “does not affect substantial rights.” The burden is on the government to show that the error here was harmless. United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); United States v. Patterson, 23 F.3d 1239, 1255 (7th Cir.1994).
*866 To avoid a finding of harmless error, the defendant “need not show that, on remand, a jury would not convict him a second time.” United States v. Richards, 719 F.3d 746, 765-66 (7th Cir.2013). Even where the defendant “probably” still would have been convicted in the absence of improper propensity evidence, the error is not necessarily harmless. Id. The proper question is “whether an average juror would find the prosecution’s case significantly less persuasive without the improper evidence.” United States v. Miller, 673 F.3d 688, 700 (7th Cir.2012); see also Kottealcos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (in case of non-constitutional error, question is whether we can say “with fair assurance” that verdict was not substantially swayed by error).
Because Rule 404(b) evidence can be so powerful and prejudicial, we have found the improper admission of other-acts drug evidence harmful despite otherwise quite strong evidence of guilt. See, e.g., United States v. Lee, 724 F.3d 968, 982-83 (7th Cir.2013) (Rule 404(b) error was not harmless although cocaine was found in trunk of car defendant was driving, cocaine’s packaging had defendant’s fingerprint on it, witness testified that defendant sold him cocaine, and phone records connected defendant to witness); Miller, 673 F.3d at 701-02 (erroneous admission of prior drug conviction was not harmless despite substantial evidence of guilt). Even when 404(b) evidence is admitted properly but is then used improperly to show propensity, we have found the error to be harmful. See, e.g., Richards, 719 F.3d at 763-66. In this case, the entire court agrees that the 404(b) evidence should not have been admitted at all because its only use was to show propensity.
The agents never did catch the conspirators in the act, as they sought to do on September 3, 2010. So let’s consider the government’s evidence indicating that Güe-ro was Gomez rather than his brother-in-law Victor Reyes, who lived in the same house and who was also observed meeting with the supplier, Romero, on September 3.
An FBI agent and a linguist testified that they played three recorded phone calls for Gomez when they interviewed him after his arrest, and that he identified his own voice as Güero on those calls. That testimony depends entirely on the credibility of the federal agents, however. They did not record this critical admission by Gomez orally or in writing. Such testimony from federal law enforcement officers is substantial evidence, of course, but the jury was not required to believe it.
As between Gomez and Reyes, the physical evidence found in the search was ambiguous. The agents found one of the cell phones Güero had used. The billing statements for all three phones Güero had used were addressed to Gomez, but the phones were registered under Reyes’s name. That evidence does not really help decide which one was Güero.
The majority’s strongest evidence that Gomez was Güero comes from telephone calls between Romero and Güero after the September 3 seizure of Romero’s car with the cocaine hidden in it. In a September 3 phone call at 9:27 p.m., Güero described someone other than himself being stopped by police, but the exchange is ambiguous:
Romero: But were they following you as well or not?
Güero: Not me, cousin, not any more. The only one they stopped was — since I saw that my brother-in-law left. They stopped him there at the school.
Romero: Him too?
Güero: Yes.
*867 Romero: What did they ask him or what?
Güero: Eh, that if he had something, if he had weapons or something, because they were supposedly looking for someone who had a weapon.
Doc. 72 at 184-85 (Call No. 34800). The agents stopped both Gomez and Reyes on September 3. Each could describe the other as his brother-in-law, so this exchange does not resolve the issue.
The majority finds more support from a call at 9:29 a.m. on September 4 but describes the conversation as including more specific details than it actually did. According to the majority:
In a recorded phone call on September 4 retracing the events of the previous day, Güero describes in the first person how the police stopped him as he walked away from his conversation with Romero; we know that happened to Gomez, not Reyes. Earlier in that same phone call Romero asked Güero what happened to Reyes, and Güero responded with an account in the third person about what happened to his brother-in-law after the three men left El Rey.
Ante at 864. Güero did not actually give Romero such explicit information about timing. Although he may well have been referring to a stop of himself on the previous day, he did not say so. And although Romero also may well have been asking Güero about Reyes being stopped (which would of course indicate that Güero was not Reyes), the name Reyes was never mentioned between them. As translated from Spanish in the official transcript, the key exchange went like this:
Romero: It seems like your brother— your brother-in-law — what happened when he came from over there? He had another car from that guy, right?
Güero: Yes. He was stopped by a sheriff. Romero: What did they tell him or what?
Güero: They — just that he was — they wanted him to give them permission to search his car. They — that they had seen him come out of El Rey over here. They asked him if he had gone to the — to get tacos or what. What did he go there for?
Romero: Is that they seen the three of us come out here?
Güero: Uh-huh.
Romero: And to you, if they saw us all together, why — I don’t understand why. How did it happen to you also?
Güero: I beg your pardon?
Romero: You also said that when you came over to the little village, you were searched. I don’t understand why.
Güero: Well, when I was turning the corner—
Romero: You were walking, right?
Güero: Yes.
Doc. 72 at 189 (Call No. 64171). A moment later in the same call, however, Romero seemed to treat the car as Gue-ro’s. Reyes was driving the car when it was stopped and taken by the agents. The context is difficult to interpret, but Romero and Güero were still talking about the events of September 3 and the seizure of the car:
Romero: Those guys see each other every once in a while. How were they doing over there? What are they doing? They have plates. They have personal plates from over there. But that’s how those guys are doing it.
Güero: Then from what I understand, they — when they bring those plates is when they bring someone from over there. Supposedly to get a person, that’s when they come out.
*868 Romero: Imagine. It can’t be. I don’t understand. It’s strange, not this dude. What did they want? What were they expecting? I don’t know what the fuck. They wanted to maybe stop you also since you also went in there in the shops and that?
Güero: I beg your pardon?
Romero: I mean, I don’t know. Maybe they were waiting for you to go in, in some house or something. I don’t know. If not that they have taken your ear just like this, dude.
Id. at 190-91.
The first passage referring to Güero being stopped while walking now seems to be the strongest evidence that Güero was Gomez. While that seems to be the most likely reading of the exchange, I am not persuaded that it renders the serious Rule 404(b) error harmless.
First, and most important, the government never made the argument that the majority makes about the significance of the phone calls. Its appellate briefs presented only the most perfunctory harmless error argument and made no mention of the September 4 phone call. Nor did the government make this point at trial. Yes, the government pointed out that Güero described being stopped on foot in one of the calls, which is something that happened to Gomez. See Doc. 75 at 14-15. But the prosecutor did not draw the contrast between the stop of Reyes and the stop of Gomez. The majority is therefore finding harmless error on an interpretation of the evidence that the government did not press before the jury.
If the majority’s new interpretation of the phone calls had been presented at trial, Gomez would have had occasion to challenge it. As it was, there was no need. And if this evidence were decisive, surely the prosecutors would have taken full advantage of it. They did not, so we do not know whether the majority’s interpretation would have withstood the adversarial test of trial. The government’s failure to make this argument on appeal also means that Gomez never had an occasion to rebut it in this court.
Rather than making the majority’s argument, at trial the government tried to prove identity by emphasizing the erroneously admitted Rule 404(b) evidence. Doc. 75 at 32-33. The prosecutor finished the opening segment of the closing argument by telling the jury that possession of this user quantity of cocaine, much less pure than the conspiracy shipments, and nearly four weeks after the charged conspiracy ended, showed Gomez’s identity, as well as knowledge and absence of mistake. Id. And of course, the district judge told the jury that the evidence could be used for all three of those unwarranted purposes. This emphasis by both the government and the trial judge is another reason the error in admitting the evidence was not harmless.
The prosecutors clearly thought the cocaine evidence was more powerful than the majority’s new theory. I think they were right. Evidence of cocaine possession in a cocaine conspiracy case is especially damning, even if it is not actually probative of any issue in dispute. In deciding whether an error was harmless, we do not act as a second jury or try to guess how the jury would have decided. We ask “whether an average juror would find the prosecution’s case significantly less persuasive without the improper evidence.” Miller, 673 F.3d at 700.
Accordingly, while the majority’s treatment of the Rule 404(b) issue is a welcome improvement on our circuit’s law, I respectfully dissent from the finding that the serious Rule 404(b) error was harmless. I *869 would reverse Gomez’s conviction and remand for a new trial.