UNITED STATES of America,
Plaintiff–Appellee,

v.

Sharon NEELEY, also known as Sharon Hill, Albert A. Alvarez, Thomas D. Lambert, also known as Demetrius, Donald L. James, Alex Burrows, Meatries, D., T., and Thomas Lambert, Defendants–Appellants.

Nos. 97–2116, 97–2729, 97–2834.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 10, 1999*.

Decided Sept. 8, 1999.

Rehearing and Rehearing En Banc Denied in No. 97-2834 Oct. 20, 1999.

* Appeal No. 97–2116 was submitted on the briefs and record without oral argument.

Colleen D. Coughlin, Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee in No. 97–2116.

Colleen D. Coughlin, Susan Haling, Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee in Nos. 97–2729, 97–2834.

David W. Gleicher, Skokie, IL, for Defendant–Appellant in No. 97–2116.

Michael B. Mann, Zavislak & Mann, Oakbrook, IL, Frederick F. Cohn, Chicago, IL, for Defendant–Appellant in No. 97–2729.

Frederick F. Cohn, Chicago, IL, for Defendant–Appellant in No. 97–2834.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

On December 13, 1995, defendants-appellants Thomas Demetrius Lambert ("Lambert"), Sharon Neeley ("Neeley"), and Albert Alexander Alvarez ("Alvarez"), along with eighteen other defendants, were charged in an eighteen count indictment with criminal drug violations. Count One charged Lambert, Alvarez, and others with conspiring to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. Count Six charged Lambert, Neeley, and others with conspiring to defraud the United States, in violation of 21 U.S.C. § 371. Count Seven charged Lambert, Neeley, and others with conspiring to commit money laundering offenses, in violation of 18 U.S.C. § 1956(h). Counts Eight and Nine charged Neeley with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

On November 4, 1996, Alvarez pled guilty to Count One of the indictment pursuant to a written plea agreement. On February 2, 1997, Alvarez filed a pro se motion to withdraw his guilty plea. The district court denied the motion to withdraw on March 5, 1997. Almost a month later, on April 2, 1997, Alvarez filed a renewed pro se motion to vacate his guilty plea, this time attaching four affidavits from other inmates testifying to his mental instability in support of his motion. On April 23, 1997, Alvarez made a motion for a psychological evaluation, at which time the district judge denied both the second motion to vacate the plea and the motion for a psychological evaluation. On June 26, 1997, the district court sentenced Alva-rez to 135 months' imprisonment for conspiracy to distribute cocaine.

Lambert and Neeley's trial commenced on November 4, 1996, and the jury found Lambert guilty of Counts One, Six, and Seven, and Neeley guilty of Counts Six, Seven, Eight, and Nine of the original indictment on December 12, 1996. Thereafter, Neeley was sentenced to 97 months' imprisonment for the money laundering offenses on May 5, 1997. Lambert was sentenced to 360 months' imprisonment for conspiracy to distribute cocaine on July 8, 1997.

On appeal, Lambert argues that: 1) the trial judge erred in refusing to grant the motion for a mistrial after excusing a juror after deliberations had begun and proceeding with 11 jurors, rather than the 12 originally impaneled; 2) the trial judge violated his Fifth Amendment right to a fair trial by admitting evidence that other conspiracy members had been shot as relevant to show the nature of the drug conspiracy; 3) the trial judge erred by admitting evidence that Lambert possessed firearms during the course of the drug conspiracy; and 4) he received the ineffective assistance of trial counsel. Neeley argues that the sentencing judge erred in refusing to sentence her as a minor participant under U.S.S.G. § 3B1.2. Finally, Alvarez argues that the district judge erred in refusing to allow him to withdraw his guilty plea and abused his discretion in denying his motion for a psychological evaluation. We affirm.

## I. BACKGROUND

Between 1987 and 1995, Nathan Hill ("Hill")[1] and his drug organization were responsible for distributing well over 2000 kilograms of cocaine in the Chicago area, obtaining most of the cocaine from suppliers in California, and generating over $15 million in profits.

---

1. Hill was a fugitive from justice at the time of Lambert and Neeley's trial.

### Thomas Demetrius Lambert

Lambert, while involved in the drug enterprise, purchased cocaine from California and transported it to Chicago, routinely handling large amounts of cocaine and money. Lambert was also responsible for picking up cars from various locations in Indiana and Illinois that had been outfitted with secret compartments for use in the transporting of the cocaine. He would deliver the cocaine to various customers and turn the proceeds over to Hill or one of Hill's minions. Furthermore, Lambert would arrange to retrieve the cocaine from the couriers traveling from California at hotels in downtown Chicago, Illinois, as well as Lansing, and Hammond, Indiana. Lambert paid the couriers in cash and gave them a one-way return ticket to Los Angeles.[2]

Lambert and others were also called upon from time to time to count the cash from the proceeds of the cocaine sales at one of Hill's apartments in Lansing, Indiana. On one particular occasion, Lambert and others counted, with the aid of a money counting machine, approximately $1 million.[3] Finally, Lambert was responsible for unpacking the cocaine from the secret compartments in various vehicles and repacking the compartments with as much as $600,000 cash.

### Sharon Neeley

Sharon Neeley, Nate Hill's older sister, was involved in the conspiracy to launder drug proceeds for the Hill organization by participating in the purchasing of residential and rental real estate properties, and assisting in the investment in businesses such as a record producing company called "Pocketown Records" and a tour bus company called "American Tour and Travel." The following evidence was presented at trial concerning the assistance Neeley provided to the Hill drug organization.

### 1. Polk Street Apartment Building

In 1988, Neeley purchased an apartment building on Polk Street in Chicago for Hill using $30,000 cash obtained through Hill's drug trafficking business. Approximately six months after the building was purchased, Hill paid contractors to renovate the building, including new windows, electrical work, and plumbing work. All this work was paid for in cash.

Neeley originally listed herself as the owner of the building, but in January 1990 she transferred the building into a land trust with the beneficial interest passing upon her death to Mary Hill (Hill and Neeley's mother); her brothers, Nate and Toby Hill; her son, Michael Hill; and her nephew, David Hill. In May 1990, Neeley amended the trust agreement so that the interest passed only to her mother.

### 2. Flossmoor House

On November 21, 1991, Neeley, her husband, Larry Neeley, and Mary Hill, entered into an installment contract with the seller to purchase a house at 1801 Lawrence Crescent, Flossmoor, Illinois, for $235,000. The contract, signed by all four parties, provided for earnest money of $20,000 to be held in escrow, $30,000 to be brought to the initial closing, monthly installment payments of $1,623.51, and the remaining balance of the contract to be due on December 6, 1993.

Records from the Beverly Bank in Cook County, Illinois, revealed that three cashier's checks and one personal check were deposited into the escrow account on October 30, 1991, and used as earnest money for the Flossmoor house. The three cashier's checks were each in the amount of $4,500; listed the remitters as Sharon Neeley, Larry Neeley, and Mary Hill; and were funded with cash from the sale of narcotics. Drug proceeds were also used to make cash deposits in Neeley's Citicorp account of $2,095, $3,000, and $1,500 on

---

2. The tickets were purchased with cash using a fake name.

3. The record does not reflect the date that Lambert counted the $1 million.

October 8th, 15th, and 17th, respectively, in order for Neeley to write a $6,500 personal check for the Flossmoor house on October 22, 1991.

On December 6, 1991, the Neeleys and Mary Hill brought a combined $30,350.48 to the closing. The $30,350.48 was in the form of sixteen money orders and cashier's checks ranging in amounts from $1,500 to $3,500 and had been purchased over a four day period from seven different financial institutions. All of these banking instruments were funded with cash from Hill's drug organization.

The Neeleys also made monthly payments on the Flossmoor house to the seller of $2,023.51 from January 1992 through November 7, 1993 for a total of $47,412.62. The payments were made from the Neeleys' personal bank account or with a money order from a currency exchange, and once again were funded with drug money. The final closing and payment of the full purchase price was on December 15, 1993. Neeley and Mary Hill brought in approximately $181,000 on that day.[4]

The seller signed a warranty deed and conveyed the property to Mary Hill. The Neeleys' names were originally on that deed and then were crossed off before the deed was recorded on January 21, 1994. Later that month, Mary Hill signed a Warranty Deed in Trust conveying the property to a Beverly Bank trust. That deed was recorded February 14, 1994. The trust stated that the entire beneficial interest in the property belonged to Mary Hill and upon her death to Neeley.

### 3. Matteson House

The Neeleys entered into a contract to purchase a piece of property in Matteson, Illinois for $145,000 on October 9, 1992. On October 14, 1992, the Neeleys made a $7,000 deposit with Century 21 as earnest money for the purchase of this property. On March 3, 1993, the installment agreement was executed by the Neeleys and the seller, and at that time the Neeleys presented a down payment of $22,000 in the form of seven financial instruments, which included personal checks, cashier's checks, and money orders from five different financial institutions, that were funded by drug proceeds. After the purchase, the Neeleys lived in the Matteson house.[5]

### 4. "American Tour and Travel" and "Pocketown Records"

One of Hill's methods to hide the proceeds of his drug business was to launder money through a bus company he invested in called American Tour and Travel Bus Company ("American") by having subordinates in the drug organization deliver duffel bags of cash to Charles Thomas ("Thomas"). American acted as the parent company for and financed another venture of Hill's known as Pocketown Records, Inc. ("Pocketown"), a record producing business.

Hill put Neeley in charge of Pocketown's financial transactions, including Pocketown's bills, corporate papers, stock certificates, and contracts. Because Hill frequently traveled to New York, Neeley assisted Thomas in locating an apartment on Hill's behalf in New York in February of 1993. Thomas, using American as a guarantor, rented this apartment for Pocketown with a payment of $16,000 down and $4,000 each month thereafter. A month later, Pocketown rented another apartment in New York for approximately $2,800 per month. When leasing this apartment, Neeley represented herself to the lessor as the manager of Pocketown.

4. This money was in the form of money orders, cashier's checks, and Pocketown business checks, all funded with drug money.

5. For reasons unexplained in the trial record, Neeley applied for a mortgage for this piece of property in 1994. In order to qualify for the mortgage, Neeley supplied the mortgage company with a false copy of a 1993 federal income tax return that she represented had been filed with the IRS. According to the government, no such tax return was ever filed.

Also in 1993, Pocketown opened four checking accounts, one at Ashland Bank in Chicago, one at Old Kent Bank in Chicago, one at South Shore Bank in Chicago, and one at the Republic Bank in New York. Neeley was the sole signatory on the Ashland and South Shore accounts, and she opened the South Shore account with a $25,000 check from Vernon Harrison, who was a drug customer of Hill's. Neeley was responsible for paying Pocketown expenses and depositing various cash amounts into Pocketown accounts.

**Albert Alexander Alvarez**

Alvarez was one of the many couriers who brought cocaine from California to the Hill organization in Chicago. On November 4, 1996, in a written plea agreement, Alvarez admitted that beginning in December of 1992 and continuing until January 23, 1993, he conspired to distribute cocaine. Alvarez admitted making seven trips by commercial airlines from California to Chicago while transporting luggage filled with between 5 to 10 kilograms of cocaine which he delivered to Hill's subordinates.

After pleading guilty, Alvarez learned that an individual in Hill's organization, who was in the same position as Alvarez, went to trial and was acquitted. Shortly thereafter, Alvarez filed a pro se motion to withdraw his guilty plea on February 2, 1997, claiming that he lacked the required mental state when he entered into a guilty plea with the government. On March 5, 1997, the district court denied the motion to withdraw the plea because "it [was] quite clear that Mr. Alvarez was not suffering from any inability, mental or otherwise, to understand the nature and extent of the proceedings and the full consequences of his plea of guilty." On April 2, 1997, Alvarez filed a renewed pro se motion to vacate his guilty plea along with affidavits from four fellow inmates recounting his alleged psychiatric instability. On April 23, 1997, Alvarez filed a motion requesting a psychological evaluation. The district court denied the second mo-

tion to vacate the plea and the motion requesting a psychological evaluation.

## II. ISSUES

On appeal, Lambert argues that: 1) the trial judge erred in refusing to grant his motion for a mistrial upon excusing a juror and proceeding with 11 jurors over the defendants' objection; 2) the trial judge violated his Fifth Amendment right to a fair trial by admitting evidence that other conspiracy members had been shot as relevant evidence of the nature of the drug conspiracy; 3) the trial judge erred by admitting evidence that Lambert possessed firearms during the course of the drug conspiracy; and 4) he received the ineffective assistance of trial counsel. Neeley argues that the sentencing judge erred in refusing to sentence her as a minor participant under U.S.S.G. § 3B1.2. Finally, Alvarez argues that the district judge erred in refusing to allow him to withdraw his guilty plea and abused his discretion in denying his motion for a psychological evaluation.

## III. ANALYSIS

**Thomas Demetrius Lambert**

*A. The trial court's decision to proceed with 11 jurors*

■ Defendant-appellant Lambert asserts that the trial judge erred in refusing to declare a mistrial upon excusing juror Mary Adam ("Adam") for "just cause" and proceeding, in spite of the defendants' objections, with eleven jurors. He argues that the district court's contact with Adam violated his constitutional rights; that the district court's investigation into Adam's stated reasons for her unavailability was insufficient; and that once Adam was excused, an alternate juror should have been substituted. We review a district court's decision to discharge a juror and proceed with eleven jurors for an abuse of discretion. *See United States v. Patterson,* 23 F.3d 1239, 1252 (7th Cir.1994).

On Friday, December 6, 1996, Lambert's jury was instructed and the two remaining alternate jurors were discharged. At 1:20 p.m., that same day, the jury began deliberating Lambert's fate, but were unable to reach a verdict by 4:30 p.m. Accordingly, they were told to go home for the weekend and to return at 9:30 a.m. the following Monday, December 9, 1996. On Monday morning, before the jury reconvened, the trial judge informed the prosecuting attorney, the defendants, and their attorneys, that a juror, Mary Adam, had left a message on the district court's answering machine in chambers stating that she would not be present because there was a custody hearing regarding her daughter's children. In the presence of Lambert and his attorney, the court summarized the nature of the message, stating:

> [i]n any event, the message that was left essentially is as follows: That she has to attend a custody hearing today because DCFS is trying to take the kids away—this is plural. She apologizes for causing you a problem, and says I can replace her and the hearing is in Kane county.

After explaining the nature of the message to the parties, the district court and all parties present, including Lambert and his attorney, agreed that the court should determine whether Adam could continue to deliberate and the following discussion took place:

> THE COURT: Well, I did not call her. Do I have your permission to call her and at least get a better handle on the situation?
>
> MS. COUGHLIN: Yes.
>
> MR. LOPEZ: Yes, Judge.
>
> MR. BAILY [counsel for Lambert]: That sounds intelligent to me, Judge, to find out if it is definite that she will be unavailable in the morning. Fine.
>
> THE COURT: All right, That is probably the better course of action. I do not, frankly, see—I have given the others enough time to get here and I do not

> see—I have at least your permission to call her, everyone who is here?
>
> MR. BAILY: Yes.
>
> THE COURT: I think that is the prudent thing to do. Let me call her. Stay here and I will report back on the subject of my discussion with her. Okay?
>
> MS. COUGHLIN: That is fine.
>
> THE COURT: All right.

After talking with Adam, the trial judge returned to the bench and summarized the details of his conversation with Adam to the parties, stating:

> I did talk to Ms. Adam. She is obviously in some state of anxiety. There is a 1:00 o'clock hearing today in Kane County before Judge Morgan. It involves the three children of her daughter, although she says—Ms. Adam says—it is only with respect to this one incident and this kid; and, the way it sound [sic] from Ms. Adam, DCFS has jumped the gun and come to conclusions that are entirely inappropriate and unsupported. You could tell that in her voice—that there is nothing there, according to Ms. Adam.
>
> She does feel mentally drained; and, I asked her mental state: Assuming everything was okay, whether she could come back here and deliberate with a decent mental state. And she and I both agreed that the only answer to that question is what will come out of the hearing.

After the custody hearing, the trial judge and Adam had a second, unrecorded telephone conversation on Monday, December 9, 1996, at approximately 4:05 p.m. The next morning, the district judge relayed the details of the conversation to the lawyers, stating:

> [h]ere is the situation with Mary Adam. She did call me about 4:05 p.m., and here is the story. Mary Adam has been awarded temporary custody of her daughter's three children. The ages are six, three and six months. She now has three more children to care for than she had before yesterday's session.

. She, therefore, will be unable to come back and act as a juror in this case.

The baby is still in the hospital, but she will get the baby as soon as the child is released.

There is a new hearing set for the 23rd of December, which is two weeks off. And she has custody of two of the children, with the third coming. There is no way in the world that she can come here and complete her service as a juror.

Beyond that, she also in her own way in her words said she does not know whether, in light of the case that she is now embroiled in by virtue of her daughter's situation, [sic] could be a juror in this case.

Based on these facts, the trial judge excused Adam from jury service in this case and ordered the remaining eleven jurors to continue to deliberate.

■ On appeal, Lambert argues that the method by which the district court dismissed Adam as a juror violated his rights under the 5th and 6th Amendments to the United States Constitution because Adam was discharged "via *ex parte* telephonic contacts, unrecorded and unreported, between the judge and the juror, out of the presence of the defendant and his lawyer...."

A criminal defendant's right to be present at every stage of trial is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (citing *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970)), and is protected to some extent by the due process clause of the Fifth and (in state cases) the Fourteenth Amendment. *See Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (under due

process, a criminal defendant has the right to be present "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."). However, the defendant's right of presence has been codified under the Federal Rules of Criminal Procedure. Under Fed. R.Crim.P. 43(a)[6] a criminal defendant has a right to be present (if he desires) during all stages of his trial, which has been held to include the giving of supplementary jury instructions or other communications with a deliberating jury. *United States ex rel. S.E.C. v. Billingsley*, 766 F.2d 1015, 1019 (7th Cir.1985) (citing *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975)); *United States v. Silverstein*, 732 F.2d 1338, 1348 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). The procedures a district judge should follow when presented with a communication from a deliberating jury were first set forth in *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). *In that case the Supreme Court stated that in such instances: (1) the jury's questions should be answered in open court; and (2) defendant's attorney should be given an opportunity to be heard before the district judge responds to the jury's questions. Id.* at 39, 95 S.Ct. at 2094. In *United States v. Burns*, 683 F.2d 1056 (7th Cir.1982), *cert. denied*, 459 U.S. 1173, 103 S.Ct. 821, 74 L.Ed.2d 1018 (1983), this circuit noted the significance of the defendant's rights under Fed.R.Crim.P. 43(a), and stated that "the district courts in this Circuit should make every effort to observe the procedures endorsed in the *Rogers* opinion." 683 F.2d at 1058 n. 1. *We reaffirmed our seriousness in adopting the Rogers procedures two years later in Billings-*

---

**6.** Rule 43(a) provides in full:

The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling

of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

*ley, where we held that a district judge, when faced with such communications from the jury, should either follow the procedures in Rogers, or obtain from the defendant himself a clear and knowing waiver on the record. Billingsley,* 766 F.2d at 1020.

*United States v. Neff,* 10 F.3d 1321, 1323–24 (7th Cir.1993) (footnote and citation in original) (emphasis added). As the Supreme Court has repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *see also Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

In this case, Lambert and his counsel were present when the trial judge explained that Adam had left a message on the court's answering machine. After carefully relaying the contents of that message, the trial judge discussed the various procedural options available to all the parties. Lambert's attorney, having had ample time to consult with his client, stated on two occasions that the judge had his permission to contact Adam and determine if she could continue serving on the jury. As soon as the judge learned of Adam's status, he relayed that information to the parties, explaining in great detail Adam's problems and the effect these problems would have on her ability to function as a juror in this case. Finally, it was only after determining that Adam had just obtained custody of three children, the youngest only six-months old and soon to be released from the hospital, that the trial judge excused Adam from the jury.

■ It is well established that the [f]ailure to secure the defendant's presence during communications between the judge and the jury violates Rule 43(a) *unless the judge answers the jury's question in open court after giving defense counsel a chance to object and the jury's question raises issues on which counsel is not likely to consult the defendant or for which the defendant*

*would not be likely to have an answer that would sway the judge.*

*United States v. Pressley,* 100 F.3d 57, 59 (7th Cir.1996) (citations omitted) (emphasis added).

In this case, Lambert was given more than ample opportunity to object to the judge's ruling as well as the method the district court judge fashioned in releasing Adam from further jury duty in the case. Not only did Lambert's counsel not object, but he affirmatively supported the trial judge's decision to telephone Adam in order that he might discuss and ascertain her situation and status. Furthermore, we don't know of anything else the judge might have done to anticipate this present challenge in light of the lack of any objection on the part of the defendant or defense counsel. We heartily agree with the trial judge's decision that it would have been nigh unto impossible for Adam to give her full and undivided attention to the necessary and important duties of a juror, i.e. jury deliberations and discussions, which were to follow. With all the information in this record, which we consider very thorough, we refuse to hold that the judge committed error in using the procedure of the telephone interview questioning, which had been previously agreed upon by all the interested parties, dealing with the question of Adam's availability to proceed.

■ Defendant-appellant Lambert also argues that the record was insufficient to conclude that Adam was excused for "just cause" within the meaning of Federal Rule of Criminal Procedure 23. According to him, there was insufficient information to determine whether Adam's obtaining custody of three young children, the youngest of which was still in the hospital, constituted just cause for being excused from continued jury service. Lambert argues that the district court's finding of just cause was, therefore, an abuse of discretion.

The Federal Rules of Criminal Procedure provide that:

[j]uries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. *Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.*

Fed.R.Crim.P. 23(b) (emphasis added). In *United States v. Araujo*, 62 F.3d 930 (7th Cir.1995) we noted the rationale for allowing the trial judge to make the determination as to whether to continue with 11 jurors, stating:

[t]he amendment to subdivision (b) addresses a situation which does not occur with great frequency but which, when it does occur, may present a most difficult issue concerning the fair and efficient administration of justice. This situation is that in which, after the jury has retired to consider its verdict and any alternate jurors have been discharged, one of the jurors is seriously incapacitated or otherwise found to be unable to continue service upon the jury. The problem is acute when the trial has been a lengthy one and consequently the remedy of mistrial would necessitate a second expenditure of substantial prosecution, defense and court resources. *See, e.g., United States v. Meinster*, 484 F.Supp. 442 (S.D.Fla.1980), *aff'd. sub nom. United States v. Phillips*, 664 F.2d 971 (5th Cir.1981) (juror had heart attack during deliberations after "well over four months of trial"); *United States v. Barone*, 83 F.R.D. 565 (S.D.Fla.1979) (juror removed upon recommendation of psychiatrist during deliberations after "approximately six months of trial").

It is the judgment of the Committee that when a juror is lost during deliberations, especially in circumstances like those in Barone and Meinster, it is essential that there be available a course of action other than mistrial.

.　　　.　　　.　　　.　　　.

The amendment provides that if a juror is excused after the jury has retired to consider its verdict, it is within the discretion of the court whether to declare a mistrial or to permit deliberations to continue with 11 jurors. If the trial has been brief and not much would be lost by retrial, the court might well conclude that the unusual step of allowing a jury verdict by less than 12 jurors absent stipulation should not be taken. On the other hand, if the trial has been protracted the court is much more likely to opt for continuing with the remaining 11 jurors.

*Id.* at 933 (quoting Rule 23 advisory committee's note).

We have gone on to explain that

[b]efore dismissing a juror pursuant to Rule 23(b), the district court must render a finding that it is necessary to do so for just cause; *and if the record does not already make clear the precise nature or likely duration of the juror's inability to serve, the court bears an affirmative duty to inquire further into those circumstances.*

*Id.* at 934; *cf. United States v. Wilson*, 894 F.2d 1245, 1250–51 (11th Cir.1990) (court was not obligated to contact absent juror or her physician where juror's history of illness and her recent telephone call to court clerk sufficiently established her incapacity); *United States v. Acker*, 52 F.3d 509, 515–16 (4th Cir.1995) (no abuse of discretion in dismissing injured juror where court did not know where she was seeking medical treatment and thus was unable to contact her).

In the present case, the parties agreed that the trial judge should contact Adam and ascertain her situation. The judge did

this and informed the parties that Adam was involved in a custody hearing concerning her grandchildren. Immediately after the custody hearing, the trial judge again spoke with Adam and learned that she was just awarded temporary custody of her three grandchildren, the youngest of whom was six months old and whose release from the hospital was imminent. Thus, she now had, in addition to whatever children were still living at home, the responsibility of caring for her three grandchildren. The judge relayed all this information to the parties. We agree with the district court judge's finding that it was impossible for Adam to continue serving as a juror because she would have been unable to give the proper attention to the jury deliberations, the most vital part of the criminal trial.

More importantly, Adam expressed her own concerns with continuing, citing the stress of the hearing, custody of three new children, and what she described as unfounded charges against her daughter. Given Adam's added responsibilities, the fact that she had just been through a trying ordeal with the DCFS, and her admittedly affected mental state, we approve of the trial judge's finding of just cause for the excusing of Adam from continued jury service.

■ Lambert's final argument with respect to the decision to remove Adam from the jury is that the trial judge abused his discretion in failing to replace Adam with one of the alternate jurors who was discharged the previous Friday. As we shall see, this argument is without merit.

After a jury begins to deliberate the district court must discharge all alternates. Fed.R.Crim.P. 24(c) ("An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."). *The Rules provide no means by which a discharged alternate may be recalled after jury deliberations have begun. We*

*have previously held that Rule 24(c) and the policy behind it "forbid the practice [of recalling alternates]."* United States v. Josefik, 753 F.2d 585, 587 (7th Cir.), cert. denied, 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985). The Fifth Circuit has recently held, reading Rules 23(b) and 24(c) together, that it is not proper to substitute a discharged alternate after jury deliberations have begun. *See United States v. Huntress,* 956 F.2d 1309, 1314–17 (5th Cir.1992), *cert. denied,* 508 U.S. 905, 113 S.Ct. 2330, 124 L.Ed.2d 243 (1993).

*Patterson,* 23 F.3d at 1252 (citations in original) (emphasis added). As is clear from *Patterson* and the fact that alternate jurors have not heard all of the jury discussions and questioning up to that point, the district court is without authority to recall an alternate juror once he or she has been dismissed and the jury has begun to deliberate. Because we see no good reason to revisit *Patterson,* nor has Lambert offered us one, we refuse to hold that the trial judge erred when he refused to recall an alternate juror after Adam was excused from continued jury service.

## B. Admission of Evidence

■ Defendant-appellant Lambert also argues on appeal that the trial judge committed reversible error when he admitted evidence that members of the conspiracy had been shot and assaulted during the course of the conspiracy, and that Lambert possessed a weapon during the course of the conspiracy because the evidence constituted "other crimes/bad man" evidence, and was irrelevant and prejudicial.[7] We review the district court's decision to admit this evidence for an abuse of discretion. *See United States v. Lowis,* 174 F.3d 881, 883 (7th Cir.1999).

Evidence is relevant and admissible if it has "any tendency to make the existence of any fact that is of consequence

---

**7.** We note that at no point during the trial did the prosecution attempt to portray Lambert

as the person who shot any member of the conspiracy.

to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401 and 402. If the probative value of evidence is "substantially outweighed by the danger of unfair prejudice," then the evidence may be excluded. Fed.R.Evid. 403. However, our decisions have emphasized that most relevant evidence is, by its very nature, prejudicial, and that evidence must be unfairly prejudicial to be excluded. *United States v. McNeese*, 901 F.2d 585, 599 (7th Cir.1990). "Evidence is unfairly prejudicial only if it 'will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented.'" *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir.1986), *cert. denied* 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986) (quotation omitted).

*United States v. Pulido*, 69 F.3d 192, 201 (7th Cir.1995).

As the trial court determined, the shooting and assault of members of the conspiracy was relevant to demonstrate the nature of this specific drug conspiracy and that there was no "tremendous prejudice at this point to the defendants because no one is named as being responsible for the shooting." Additionally, the indictment charged that as part of the conspiracy, Nate Hill and others "possessed firearms during and in relation to the cocaine conspiracy to provide security for the conspiracy." Obviously, the fact that members of the conspiracy were shot or assaulted provides an explanation as to why the conspirators believed they needed firearms to protect themselves. Furthermore, over the thirteen day trial, the testimony concerning the shooting and assaults was extremely brief in comparison to the amount of evidence introduced by the government. Finally, the introduction of this evidence allowed the jury to have a complete picture of the conspiracy, ensuring an informed and fair decision was rendered. *See Pulido*, 69 F.3d at 202 ("[T]he exclusion of evidence concerning the triple murder at the Drake Avenue apartment would have created a 'chronological and conceptual void' in the government's case against Pulido, leaving jurors with significant questions about Lopez' relationship with Pulido and Lopez' decision to cooperate with the government."); *United States v. McNeese*, 901 F.2d 585, 599 (7th Cir.1990) (This court held that it was not an abuse of discretion for the district court to allow evidence of an attempted murder as part of the relevant and admissible evidence in a drug conspiracy trial because the exclusion of the attempted murder evidence in that case would have left a "chronological and conceptual void" in the account of events surrounding the role of one of the co-conspirators in the drug conspiracy); *United States v. Vretta*, 790 F.2d 651, 656 (7th Cir.1986) (exclusion of evidence would leave jury with "a sanitized version of the crime with too many gaps and questions left dangling . . . thus forcing the jury to speculate."). Accordingly, we refuse to hold that the trial court committed reversible error when admitting evidence concerning the shooting and assault of various members of the conspiracy.

■ Lambert also argues that the district judge committed reversible error when admitting evidence concerning his possession of firearms. Lambert admits that some evidence regarding his possession of firearms would be relevant, but contends that the amount of evidence introduced by the government concerning his possession of firearms amounted to "prosecutorial overkill." As stated above, evidence is relevant and admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401 and 402.

In this case, evidence was introduced to establish that not only did Lambert carry a gun for protection but that he also attempted to transport a large number of weapons from California to Chicago on behalf of the conspiracy. As we have stat-

ed in the past, "firearms are recognized as tools of the drug trade; thus, courts have sustained the admission of weapons evidence in narcotics cases because the possession of a weapon is often a hallmark of drug trafficking." *United States v. Hubbard*, 61 F.3d 1261, 1270 (7th Cir.1995). In light of the fact that evidence of weapon possession is typically relevant in drug cases and especially considering Lambert's admission that his possession of firearms was relevant evidence in this case, his argument that the government introduced "too much" relevant evidence concerning his possession of weapons is patently without merit.

■ Lambert's final argument on appeal is that he received the ineffective assistance of counsel because of his trial counsel's acquiescence to the judge's proposed method of resolving Adam's situation, trial counsel's failure to make timely objections, and counsel's failure to request a limiting instruction as to the "other-crimes evidence."

Ordinarily, this issue is not appropriate for direct review because "we have repeatedly held that ineffective assistance of counsel claims are best dealt with at the district court level brought through a motion for a new trial or through collateral relief available under 28 U.S.C. § 2255." [*United States v. Mojica*, 984 F.2d 1426, 1452 (7th Cir. 1993)] (citations omitted). "The reason for this preference is that 'the district court, unlike the appellate court, has had the opportunity to observe counsel's performance firsthand,' and typically, there has been no chance to develop and include in the record evidence relating to the ineffectiveness issues." *Id.* (quotation and citation omitted). Nevertheless, this court has held on a number of occasions that "we have the discretion to

resolve ineffective assistance claims without the benefit of the district court's views in circumstances where the record is 'sufficiently developed' to consider the issue, or where 'both parties ask us to resolve the matter, the question has been briefed and argued, ... and the entire trial record is before us'" *id.* (quotations omitted), or where "the issue is sufficiently clear-cut." *United States v. Zarnes*, 33 F.3d 1454, 1473 (7th Cir. 1994), *cert. denied*, 515 U.S. 1126, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995) (quoting *United States v. Limehouse*, 950 F.2d 501, 503 (7th Cir.1991), *cert. denied*, 504 U.S. 918, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992)). Both parties have briefed ... the issue before us, we have reviewed the record, and for the reasons explained herein, the issue of ineffective assistance of counsel is sufficiently developed to allow our review. Thus, we deem it advisable to review the merits of [Lambert's] claim.

*United States v. Boyles*, 57 F.3d 535, 550 (7th Cir.1995) (citation in original).

■ With regard to Lambert's claim that his trial counsel was ineffective in dealing with the question of the excused juror, it was imperative that the trial judge ascertain Adam's status before making a decision whether to adjourn the trial and hold the jury panel longer, continue with the eleven jurors, or declare a mistrial. *See Araujo*, 62 F.3d at 934. Even now, with the benefit of hindsight, we see no error with the decision to allow the district court to contact Adam *ex parte* and ascertain her availability. The fact that Lambert's counsel also saw no problem with this arrangement at the very time the decision was in the making can not, now, under any stretch of the imagination, be considered ineffective assistance of counsel.[8]

---

8. We see no reason why an objection to the procedure used by the judge should have been made especially given, "the pervasive use ... of telephone and related services." *See Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir.1989). In fact, telephones are used to conduct pre-trial motions, hear oral argument, and even issue warrants. *See e.g.*, Fed. R.App. P. 16(c); Fed.R.Crim.P. 41(c)(2). As we move forward into the electronic age,

■ Lambert's second claim of ineffective assistance, that trial counsel failed to make timely objections and request a limiting instruction, fares no better. As discussed in length previously in the opinion, the trial judge committed no error in admitting the evidence Lambert now complains of. Obviously, counsel can not be considered ineffective for failing to make an objection to the introduction of evidence that was properly admitted. *See e.g.,* *United States v. Draves,* 103 F.3d 1328, 1335–36 (7th Cir.), *cert. denied,* 521 U.S. 1127, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997); *Boyles,* 57 F.3d at 550. From our review, we are convinced that Lambert did not receive the ineffective assistance of counsel.

## Sharon Neeley

■ On appeal, Neeley argues that because her participation in the real estate transactions, American Tour, and Pocketown was minor when compared to the conspiracy as a whole, the district court's denial of her request for a minor participant reduction pursuant to U.S.S.G. § 3B1.2[9] was erroneous and warrants a remand for resentencing. We review the district court's § 3B1.2 determination under the clearly erroneous standard. *See* *United States v. Soto,* 48 F.3d 1415, 1420 (7th Cir.1995). " 'The district court's sentence thus will be affirmed if it results from a proper application of the sentencing guidelines to facts not found to be clearly erroneous.' " *Id.* (quoting *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir. 1989)).

we are attempting to make the court friendly to jurors, litigants, court employees, and those who are called into court, i.e. witnesses. In this case, rather than waste the taxpayers' money, inconvenience the jury by adjourning, and delaying the next case, the trial judge merely adopted a commonly used procedure to ascertain Adam's availability. As such, in a time of unparalleled increases in federal litigation, we can not disagree with the judge's decision to telephone Adam; a decision which increases the court's productivity and improves case management.

■ Neeley asserts that she was entitled to a reduction in her offense level under § 3B1.2 because she merely acted as a clerk who paid bills and kept corporate paper in order, i.e., that she had a minor role in the money laundering conspiracy. In so arguing, Neeley is asking us to focus on the conspiracy as a whole and not the specific criminal activity, within the overall conspiracy, she was convicted of. In determining the applicability of § 3B1.2, however, " 'the relevant inquiry is whether the defendant was a minor participant in the crime for which [she] was convicted, not whether [she] was a minor participant in some broader conspiracy that may have surrounded it.' " *United States v. Griffin,* 150 F.3d 778, 787 (7th Cir.1998) (quoting *United States v. Brown,* 136 F.3d 1176, 1185–86 (7th Cir.1998)).

As discussed at length earlier in the opinion, Neeley laundered much of Hill's drug money through a number of real estate transactions on his behalf, including the Polk Street Apartment building, the Flossmoor house, and the Matteson house. Even Neeley's counsel on appeal concedes that with respect to her laundering money through real estate transactions, "it is true that she was not a minor actor." Neeley's counsel argues that we should not focus on Neeley's real estate transactions but rather on her role at American and Pocketown. Neeley argues that her position at American mandates that she be considered a minor participant when the conspiracy is viewed as a whole. We do not agree that we should have so singular a focus.

9. Section 3B1.2 states:

Based on the defendant's role in the offense, decrease the offense level as follows:
(a)If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
(b)If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

As discussed above, one of Hill's methods to hide the proceeds of his drug business was to launder money through Pocketown and its parent company American Tour. Neeley was involved in the daily operations of Pocketown, and was in charge of all of Pocketown's bills, corporate papers, stock certificates, and contracts. Neeley also assisted Pocketown in the locating and purchasing of two apartments in New York on Hill's behalf. In obtaining one of the apartments, Neeley represented herself to be the manager of Pocketown. Additionally, Neeley was the sole signatory on two of Pocketown's corporate accounts and was also responsible for depositing various cash amounts into those accounts. Based on the record before us, we do not agree with the defendant's arguments and find it inconceivable that Neeley could be considered a minor participant in the money laundering conspiracy for which she was indicted and convicted. *See Griffin*, 150 F.3d at 787; *Brown*, 136 F.3d at 1185–86. Accordingly, we are of the opinion that the district court did not commit error, clear or otherwise, in denying Neeley's request for a minor participant reduction.

### Albert Alexander Alvarez

Defendant-appellant Alvarez argues that the trial court erred in refusing to allow him to withdraw his guilty plea because he was not psychologically competent to enter into a plea of guilty. Alvarez also argues that the district judge committed reversible error when he refused to order a psychiatric evaluation of Alvarez before denying the motion to withdraw his guilty plea. We do not agree with Alvarez's characterization of events.

It is now axiomatic that [n]o defendant has an absolute right to withdraw a guilty plea. *United States v. Schilling*, 142 F.3d 388, 398 (7th Cir. 1998). Prior to sentencing a district court may permit withdrawal if presented with a "fair and just" reason, Fed. R.Crim.P. 32(e); *United States v. Abdul*, 75 F.3d 327, 329 (7th Cir.1996), but the burden of justifying relief rests with the defendant, *United States v. Coonce*, 961 F.2d 1268, 1275 (7th Cir.1992). Absent clear error we must accept a district court's findings about the propriety of the reasons given for seeking to set aside a guilty plea. *Schilling*, 142 F.3d at 398. And because the decision whether to permit withdrawal is one committed to the district court's discretion, *Abdul*, 75 F.3d at 329, we will uphold the denial of a motion to withdraw a guilty plea unless that discretion is abused, *Schilling*, 142 F.3d at 398. *United States v. Underwood*, 174 F.3d 850, 852–53 (7th Cir.1999); *see also Schilling*, 142 F.3d at 398. Furthermore, "[w]hen a defendant wishes to withdraw his plea [of guilty] after he states at a Rule 11 hearing that it was freely and knowingly given, he faces an uphill battle in persuading the judge that his purported reason for withdrawing his plea is fair and just." *Schilling*, 142 F.3d at 398 (internal quotations and citations omitted); *see also United States v. Messino*, 55 F.3d 1241, 1248 (7th Cir.1995); *United States v. Trussel*, 961 F.2d 685, 689 (7th Cir.1992). Alvarez has failed to convince us that the district court committed error.

Prior to accepting Alvarez's guilty plea, the trial judge conducted a thorough examination of the defendant, during which time Alvarez's answers were both coherent and responsive. It was only after having had the opportunity to assess his responses, demeanor, conduct, and appearance, that the judge determined that Alvarez was competent. Additionally, when queried by the same judge, neither his own counsel nor the government were cognizant of any manifestations of mental incapacity or any other reason to question Alvarez's competence to enter a plea of guilty. Furthermore, the district court conducted a lengthy Rule 11 plea colloquy during which Alvarez consistently stated that he understood all the consequences of pleading guilty. Finally, Alvarez, at the court's request, gave a short narrative of

his role in the offense. The trial judge found that these factors, when combined, undercut any argument that Alvarez should be permitted to withdraw his guilty plea.

We are convinced that the lengthy and coherent exchange between the district court judge and Alvarez during the Rule 11 colloquy demonstrates that Alvarez was competent to plead guilty and that he understood the legal consequence of doing so. As the trial judge did, we find it very interesting that Alvarez did not even attempt to withdraw his guilty plea until after a similarly situated co-defendant in the Hill organization was acquitted. After our review of the record, we refuse to hold that the district court committed error in denying the motion to withdraw Alvarez's guilty plea. For the same reasons discussed before, we also refuse to hold that the district court abused his discretion in denying Alvarez's request for a psychiatric examination. *See United States v. Rovetuso,* 768 F.2d 809, 824–25 (7th Cir.1985).

## IV.   CONCLUSION

We conclude that the trial judge did not err in refusing to grant Lambert's motion for a mistrial after excusing a juror and proceeding with 11 jurors over his objection. Also, the trial judge correctly admitted evidence that other conspiracy members had been shot and assaulted as relevant evidence of the nature of the drug conspiracy and evidence that Lambert possessed firearms during the course of the drug conspiracy. Finally, the record does not support Lambert's assertions that he received the ineffective assistance of trial counsel. With regard to Neeley, we hold that the sentencing judge committed no error when refusing to sentence her as a minor participant under U.S.S.G. § 3B1.2. Finally, Alvarez's argument that the district judge erred in refusing to allow him to withdraw his guilty plea and abused his discretion in denying his motion for a psychological evaluation is without merit.

Accordingly, the sentences and convictions of Lambert, Neeley, and Alvarez are

AFFIRMED.