# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 03-1838, 03-1849 & 03-1878

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

HERMAN HICKS, RADAR TYLER,
and DRIEFUS HARBIN,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 98 CR 78—**Rudy Lozano**, *Judge.*

———————

ARGUED JANUARY 5, 2004—DECIDED MAY 21, 2004

———————

Before CUDAHY, POSNER, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* A jury convicted Herman Hicks, Radar Tyler, and Driefus Harbin of, among other offenses, conspiring to possess with intent to distribute and conspiring to distribute more than fifty grams of crack cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). In this consolidated appeal, all three defendants contest the sufficiency of the conspiracy evidence against them and the district court's decision to allow various acts of violence, including murders, into evidence as support for the government's conspiracy theory. Harbin also challenges his sentence, al-

leging that the district judge erred in refusing to grant him the two-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. We affirm in all respects.

## I. History

This is the second time the defendants have been convicted of a drug conspiracy charge. We overturned the first conviction because of the government's mid-trial use of a peremptory challenge with respect to a particular juror. *See United States v. Harbin*, 250 F.3d 532 (7th Cir. 2001). Upon retrial, the government again sought to prove that Hicks, Tyler, and Harbin were part of an informal gang called the "22nd Avenue Boys," named for the street in Gary, Indiana where most of the members lived, gathered, and, unfortunately, distributed crack to the many addicts in Gary's midtown area. The gang considered itself affiliated with an organized street gang called the Vice Lords. Over objection, evidence admitted at trial demonstrated that the 22nd Avenue Boys engaged in violent territorial disputes with other Gary street gangs and sometimes with each other. The obvious inference to be drawn from such activity was that what the 22nd Avenue Boys sought to protect was the right to sell crack in midtown Gary.

The majority of the evidence presented against the defendants during the two-week trial came from co-conspirators—other 22nd Avenue Boys—who agreed to cooperate in exchange for leniency. Included among them was the leader of the conspiracy, Tajuan Allen. Allen and others testified that during the period covered by the indictment, which included the summer of 1995 to July of 1998, Allen ran more than a dozen crack houses in succession and supplied at least some of the crack that was sold out of them. Allen either charged those dealing out of his houses up front for the drugs he supplied or "fronted" the drugs, meaning he

provided the crack without payment, expecting to be paid once the crack was sold. If he was short on drugs or if others obtained their own, perhaps at a better price, he let them sell out of his houses anyway, but only with his permission, and, at least in some instances, if the dealers paid him a "consult," or a fee, for access to the house and its stream of customers. On a good day, his house would serve 100 customers or more, bringing in $2000 to $3000. To meet customers' needs, the houses operated twenty-four hours a day, seven days a week, with sometimes between ten to fifteen people dealing out of a house at one time. Generally, not all the dealers would be present around the clock; they would come and go throughout the day and night. The houses were "organized up" so that the dealers took turns serving the customers, ensuring that no one dominated the customer flow.

Allen and others placed the defendants at particular crack houses, although not in every one run by Allen. Numerous witnesses testified that they either purchased crack from the defendants or saw the defendants sell crack at those houses. The defendants were also seen in Allen's "chill house," a house away from 22nd Avenue where Allen cooked crack, stored drugs and weapons, and where he and his dealers could relax and get high without fear of raids by law enforcement.

## II.  Analysis

### A.  Sufficiency of the Evidence

The defendants do not deny that they were crack dealers. They do deny that they were engaged in a conspiracy with Allen to distribute crack, arguing that the government demonstrated, at most, a buyer-seller relationship between Allen and the defendants.

The standard of review facing the defendants on their claim that the jury had insufficient evidence to convict is a

daunting one. *See United States v. Curtis*, 324 F.3d 501, 505 (7th Cir.), *cert. denied*, ___ U.S. ___, 124 S. Ct. 505 (2003); *United States v. Sanchez*, 251 F.3d 598, 601 (7th Cir. 2001) (calling a sufficiency of the evidence challenge an "uphill battle"). Considering the great deference owed to the jury's verdict, we will view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001); *see also Sanchez*, 251 F.3d at 601.

To prove a conspiracy under 21 U.S.C. § 846, the government had to show that "(1) two or more people agreed to commit an unlawful act and (2) the defendant[s] knowingly and intentionally joined in the agreement." *Gardner*, 238 F.3d at 879. In the case of a drug distribution conspiracy, the agreement must amount to more than just the sale of the drugs themselves. *Curtis*, 324 F.3d at 505. Rather, the government needs to demonstrate "an understanding—explicit or implicit—among co-conspirators to work together to commit the offense." *Id.* If the prosecution succeeds in establishing a conspiratorial agreement under the first element of the offense, it must then show that the defendants knew about the conspiracy and chose to associate with the "criminal scheme." *Id.*

To distinguish between a buyer-seller relationship and a conspiratorial agreement, we look for evidence of a prolonged and actively pursued course of sales, coupled with the defendants' knowledge of and shared stake in Allen's illegal venture. *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001). Factors considered in determining whether the association at issue amounts to a conspiracy include whether there was prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit ("fronting"), and the quantity of drugs involved. *Sanchez*, 251 F.3d at 602; *Contreras*, 249 F.3d at

599. "Although none of these factors is dispositive, if enough are present and point to a concrete, interlocking interest beyond individual buy-sell transactions, we will not disturb the factfinder's inference that at some point, the buyer-seller relationship developed into a cooperative venture." *Contreras*, 249 F.3d at 599.

The defendants' relationship with Allen had ample indicia of a "cooperative venture" to support the jury's verdict. All three defendants had extended relationships with Allen. Both Hicks and Tyler sold crack out of Allen's houses beginning in 1995. Hicks sold on and off at Allen's various houses throughout the duration of the three-year conspiracy. While Tyler's involvement with Allen tapered off toward the end of the conspiracy, ostensibly because of increased law enforcement focus on Allen's enterprise, he continued to sell for brief periods in Allen's houses. He also visited Allen's last crack house the day after Dontrell Hamilton's murder to report that the police were looking for Allen to question him about a homicide. Both Hicks and Tyler were involved in various shoot-outs with rival gangs in an apparent effort to protect the 22nd Avenue territory. Harbin, who had no involvement in the turf warfare, started selling out of Allen's houses the last six months of the conspiracy, but did so consistently up until the day of his arrest during the raid on Allen's final crack house. All three defendants had access at one time or another to the "chill house" stocked with drugs and weapons, demonstrating, along with their long affiliation with Allen, a modicum of trust between them and Allen.

Allen established rules for selling at his houses, standardizing and controlling his relationships with his dealers, including the defendants. If they weren't selling his crack, the dealers had to have his permission to sell at the house and sometimes pay a "consult" fee. The dealers had to take turns selling to the customers who came to the doors and windows of the house so that the profits were evenly dis-

tributed among those present. In at least one circumstance, when trouble arose among the dealers because of some missing drugs, Allen was called to settle the argument. He did so by authorizing the death of Dontrell Hamilton, the dealer suspected of stealing. Once, when Tyler decided to sell on the street opposite Allen's crack house, Allen pistol-whipped him for bleeding customers from the house and ordered him back inside.

The evidence showed that Allen supplied all three defendants with drugs. The government also presented testimony that Allen fronted crack to both Tyler and Hicks on occasion. Due to the length of the conspiracy, the number of customers visiting the houses, the amount of money pulled in on a daily basis, and the quantity of drugs purchased by Allen from his suppliers, the jury could reasonably infer that the amount of drugs passing through the conspiracy was considerable.

In sum, a finder of fact could easily conclude that the government proved the first element of the conspiracy offense—that a conspiratorial agreement existed. The government also supplied ample evidence to support the second element of the offense. Considering, at a minimum, that the defendants all sold in multiple houses with the requirement that they sell Allen's crack or get his permission to supply their own, the jury could easily infer that the defendants knew about the conspiracy and chose to join with the "criminal scheme."

We note that the quantum of evidence in this case far exceeds what we determined was sufficient for finding a conspiracy in *United States v. Gardner*, 238 F.3d 878 (7th Cir. 2001). There, Gardner sold his own crack out of a crack house five times by asking the owner, when customers came by, whether he could "get that one." *Id.* at 880. Gardner was charged, among other offenses, with conspiracy to maintain a crack house under 21 U.S.C. § 846. We upheld Gardner's

conviction, finding that he knew about the conspiracy because he actually sold crack from the house on five occasions and specifically asked permission to sell crack to customers who came to the house. *Id.* We also determined that, like the defendants and Allen here, Gardner and the owner had a mutual interest—Gardner needed the crack house to succeed so he had a place to sell his drugs, and the owner needed Gardner's help to ensure a steady supply of crack to the customers. *Id.*

Based on the abundant evidence presented at trial, any rational trier of fact could have found the defendants guilty beyond a reasonable doubt of conspiring with intent to distribute and conspiring to distribute crack. This was not a close case, and we will not disturb the jury's verdict.

## B.  Acts of Violence

The defendants next argue that the district judge abused his discretion in allowing the government to present evidence related to the murder of 22nd Avenue Boy Dontrell Hamilton and other acts of violence committed by or against the gang. The defendants claim that the evidence was either irrelevant under Federal Rule of Evidence 401 or prejudicial and cumulative under Rule 403.

Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Yet, where the probative value of relevant evidence is "substantially outweighed by the danger of unfair prejudice" or where presentation of relevant evidence would be needlessly cumulative, it may be excluded. Fed. R. Evid. 403; *see also United States v. Pulido*, 69 F.3d 192, 201 (7th Cir. 1995). Because we have acknowledged that most relevant evidence, by its very nature, is prejudicial, only *unfairly* prejudicial evidence *must* be excluded. *Pulido*, 69

F.3d at 201. "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Id.* (quotations omitted).

"We give special deference to a trial judge's evidentiary rulings 'because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding.'" *United States v. Hernandez*, 330 F.3d 964, 969 (7th Cir. 2003), *cert. denied*, ___ U.S. ___, 124 S. Ct. 1599 (2004) (quoting *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998)). Only where the district court has clearly abused its discretion, meaning that "no reasonable person could take the view adopted by the trial court," will we reverse an evidentiary ruling. *Id.* (quotation omitted).

The district court allowed evidence of Hamilton's murder, executed with Allen's permission because he believed Hamilton stole another dealer's drugs, as it tended to show Allen's control over the crack houses and the dealers, making the murder "inextricably intertwined" with the crack distribution conspiracy. The government offered other acts of gang violence to support its theory that the 22nd Avenue Boys, of which the three defendants were members, worked together to protect its midtown Gary drug distribution enterprise.

Our case law supports the district judge's conclusion that the Hamilton murder and other violent acts were relevant to the government's conspiracy theory. For example, in *United States v. Thompson*, we found no error in the trial judge's admission of several non-fatal shootings and a kidnaping committed by drug distribution co-conspirators, noting that "[t]his kind of evidence is intricately related to the drug conspiracy charge because it shows how the conspiracy conducted its 'business.'" 286 F.3d 950, 969 (7th

Cir. 2002), *cert. denied*, 537 U.S. 1134 (2003) (collecting cases); *see also United States v. Neeley*, 189 F.3d 670, 682 (7th Cir. 1999) (finding that admission of evidence related to the shooting and assault of members of a drug conspiracy was relevant to demonstrate the nature of the conspiracy). Here, Hamilton's murder and the other acts of violence supported the government's theory that Allen and the defendants were engaged in a cooperative enterprise— not just a buyer-seller relationship as alleged by defendants—which they defended through violence and which Allen controlled through violence.

The prejudice, if any existed, did not outweigh the probative value of the evidence under Rule 403 because the testimony regarding Hamilton's murder and other acts was brief and devoid of gruesome details, primarily limited to a recitation of who shot at whom, on which side of town, and why. *See Pulido*, 69 F.3d at 202 (testimony concerning murders "was brief and non-inflammatory in nature, reducing any risk that the jury's emotion would be stirred by such evidence and . . . be compelled toward irrationality"); *Hernandez*, 330 F.3d at 971 (brief references to gang violence found not to have a substantial influence on the jury's decision); *Neeley*, 189 F.3d at 682 (evidence of violent acts admissible, in part because the testimony was extremely brief in comparison to the total amount of evidence introduced by the government). Further, defense counsel had ample opportunity to cross-examine the witnesses and establish that the defendants had no involvement in Hamilton's murder and certain other acts of violence.

We also find that the evidence was not cumulative, again considering its importance to the government's conspiracy theory, the summary way in which the majority of the incidents were related, and the comparatively small amount of time devoted to their recitation during the two-week trial. *See, e.g.*, *Hernandez*, 330 F.3d at 971 (upholding the

admission of gang violence evidence where it was comparatively slight in light of the length of trial); *Neeley*, 189 F.3d at 682 (same).

### C. Harbin's Acceptance of Responsibility

After his first conviction was overturned on appeal, Harbin entered a plea agreement with the government rather than face retrial. The government made the agreement contingent on Hicks and Tyler also entering into plea agreements. When they refused to do so, the government moved to withdraw Harbin's agreement. Harbin objected, but the court upheld the terms of the agreement and granted the government's motion because the Hicks/Tyler contingency had not been met. Harbin then proceeded to trial alongside his co-defendants Hicks and Tyler.

At sentencing, Harbin argued that he was entitled to a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 because of his demonstrated intent prior to trial to enter into a plea agreement with the government. The district court disagreed and refused to give the requested adjustment.

We review the district court's fact-based decision not to grant an acceptance of responsibility reduction for clear error. *United States v. Williams*, 202 F.3d 959, 961 (7th Cir. 2000). "We give great deference to the district court's conclusion in this matter as that court is in a unique position to assess the defendant's motives and genuineness in professing to accept responsibility for his crime." *Id.*

The district court decided not to give Harbin the acceptance of responsibility adjustment because he put the government to its burden of proof at trial. The Sentencing Guidelines commentary specifically supports this conclusion. *See* U.S.S.G. § 3E1.1 cmt., n.2 ("[The acceptance of responsibility] adjustment is not intended to apply to a

defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt . . . ."); *see also Williams*, 202 F.3d at 962 ("Ordinarily a defendant who chooses to go to trial and force the government to prove his guilt is not eligible to receive a sentence reduction for acceptance of responsibility."). Harbin, though, alleges that at trial he sought only to challenge the amount of crack attributable to him, not his underlying guilt of the conspiracy charge. He reasons that under this view of his defense, his conduct at trial falls under a Guideline exception for those who proceed to trial solely to challenge issues other than factual guilt. *See* U.S.S.G. § 3E1.1 cmt., n.2.

While we have recognized those who go to trial to challenge, for instance, the constitutionality of a statute as eligible for the acceptance of responsibility adjustment under the Guideline exception, "[i]f a defendant challenges factual evidence of guilt as well as legal principles, however, he typically will be ineligible to receive the acceptance of responsibility reduction." *Williams*, 202 F.3d at 962. Here, it's clear from the trial transcript that Harbin not only challenged the amount of crack attributable to him, he also challenged his involvement in the conspiracy as a whole. *See Hernandez*, 330 F.3d at 984-85 (denying acceptance of responsibility adjustment where defendant's plea negotiations on drug distribution conspiracy count fell apart before trial and where he later denied any involvement in the conspiracy at trial).

Further, while we do not decide whether challenging the amount of crack attributable to him can be considered a "legal principle," rather than factual evidence of guilt, to the extent Harbin wished to limit his appearance at trial to that challenge only, he was obligated to make that known ahead of time. That way, the government would not waste resources preparing to prosecute him for the crimes alleged in the indictment but could tailor its case to Harbin's

specific challenge. *Williams*, 202 F.3d at 962 (noting that under U.S.S.G. § 3E1.1 cmt., n.2, a determination that a defendant has accepted responsibility should be based primarily upon pretrial statements and conduct and refusing to grant the adjustment where the defendant failed to notify the court either before or during trial that he planned to only challenge the legal standard under which he was being prosecuted). Harbin did not do so, putting the government to its burden of proof and making him ineligible for the acceptance of responsibility adjustment.

### III. Conclusion

For all of the above reasons, the determinations of the trial court are AFFIRMED.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*